**Kiiko NAKAHARA and Jean–Paul Renoir, Plaintiffs,**

v.

**The NS 1991 AMERICAN TRUST, a Delaware business trust, Defendant,**

v.

**Nihon Sangyo Kabushiki Kaisha, a Japanese corporation, Defendant–Intervenor.**

**C.A. No. 15905.**

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 25, 1997.

Decided: March 20, 1998.

Edward M. McNally, Richard D. Kirk, and Nancy R. Walsh, of Morris, James, Hitchens & Williams, Wilmington, Delaware, for plaintiffs.

Stephen E. Jenkins, of Ashby & Geddes, Wilmington, Delaware, for defendant.

David S. Eagle, of Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, Delaware; and Abbe F. Fletman, and Glen A. Weiner, of Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Philadelphia, Pennsylvania, for defendant-intervenor.

### OPINION

CHANDLER, Chancellor.

Plaintiffs are managing trustees of a Delaware business trust seeking advance indemnification from the trust under an advancement provision in the trust's governing instrument. The trust agrees that plaintiffs are entitled to advancement. A beneficiary of the trust's parent trust objects to the advancement on the. grounds that the Delaware Business Trust Act does not permit business trusts to advance litigation expenses to trustees and, even so, plaintiffs have not satisfied the pre-conditions set forth in the business trust's advancement provision. I find that Delaware's Business Trust Act does permit business trusts to make advancements to their trustees. I further find that plaintiffs have satisfied all prerequisites imposed by the advancement provision of the American Trust's governing instrument. Because I find that plaintiffs suffer from unclean hands, however, I cannot authorize the payment of these advancements in this case.

This is my decision on defendant NSKK's motion for partial summary judgment as well as my decision on the merits of the case following the trial held on November 25, 1997. Part I of this decision reviews the factual and procedural history of the case. Part II contains my discussion and decision on the partial summary judgment motion. Finally, Part III contains my discussion of and decision on the merits of the case.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiffs Kiiko Nakahara ("Nakahara") and her husband, Jean–Paul Renoir ("Renoir") (collectively, "plaintiffs"), are the managing trustees of defendant The NS 1991 American Trust (the "American Trust"), a Delaware business trust formed in November 1991. Nakahara and Renoir are named as two of several defendants in two actions pending in the Supreme Court of the State of New York, New York County concerning, among other things, rightful ownership of the Empire State Building in New York City.[1] Pursu-

---

1. *Nippon Sangyo Co. Ltd. v. Nakahara, et al.,* Index No. 94/130874 (Sup.Ct.N.Y.County) (the "NSKK litigation") and *Empire State Building Associates, et al. v. Trump, et al.,* Index No. 95/113519 (Sup.Ct.N.Y.County) (the "Empire State litigation"), (collectively, the "New York litigations").

The Empire State litigation has been dismissed as to Nakahara and Renoir, although that decision is on appeal. NSKK's pretrial

ant to an indemnification provision in the American Trust's Declaration of Trust,[2] plaintiffs—as managing trustees of the American Trust—seek, via this Court of Chancery action, advancement of their litigation expenses in connection with defending the two New York lawsuits.

Central to the NSKK litigation is the question whether Hideki Yokoi ("Yokoi"), principal shareholder of the Japanese corporation Nihon Sangyo Kabushiki Kaisha ("NSKK"), gave Nakahara, his daughter and director of NSKK, $40 million to purchase the Empire State Building for NSKK as part of a business transaction or whether the $40 million was simply a gift from father to daughter. NSKK accuses Nakahara of breach of fiduciary duty, alleging that she improperly used a power of attorney to fraudulently transfer property belonging to NSKK into an offshore trust system of which Nakahara is the principal beneficiary.[3] The NSKK litigation also asserts claims against Renoir for his participation in this "scheme to defraud" NSKK.

As of 1993, the principal asset of this offshore trust system was an interest in the Empire State Building.[4] On October 27, 1993, via a deed executed by Renoir as managing trustee, the American Trust transferred its interest in the Empire State Building to its wholly-owned subsidiary, the NS 1999 American Company Ltd. (the "American Company"), of which Renoir is the president.[5] Thereafter, the American Company joined with Trump Inc. to form Trump Empire State Partners, controlled by Nakahara, Renoir and Donald Trump.[6] The American Company transferred its interest in the Empire State Building to this general partnership on or about June 28, 1994.[7] These transfers, ultimately to Trump Empire State

---

memorandum suggests that plaintiffs have abandoned their claim for advancement in that action. (NSKK's Pre-Trial Memo. at 2 n. 1.) Plaintiffs, however, have declared that they still seek advancement with regard to both New York litigations. (Letter from E. McNally, dated Dec. 4, 1997.)

2. Section 4.2(d) of the American Trust's governing instrument provides that the "[e]xpenses of preparation and presentation of a defense to any claim, action, suit, or proceedings [in which an individual becomes involved by virtue of his being or having been a Trustee] shall be advanced by the [American] Trust prior to final disposition thereof" if certain conditions are satisfied. Decl. of Trust § 4.2(a), (d).

3. This offshore trust system consists of: (1) The NS 1991 Trust (the "Isle of Man Trust"), which is the 100% owner of (2) ESB Real Estate N.V., a Dutch Antilles company, which is the 100% owner of (3) ESBAP B.V., a Dutch company, which is the 100% owner of (4) The NS 1991 American Trust (the "American Trust")—of which plaintiffs are the managing trustees—which is the 100% owner of (5) the NS 1999 American Company Ltd. (the "American Company"). See Chart attached as Appendix A. The American Trust is the defendant in this Delaware Court of Chancery action.

4. In 1991, an American Trust nominee—E.G. Holding Company—purchased the Empire State Building fee (encumbered by an ex-

tremely long-term lease) with money loaned to it by the American Trust in exchange for a pledge of the nominee's stock. When the nominee defaulted on the loan in 1992, the stock of the nominee company was defaulted to the American Trust. In April 1993, the American Trust merged the assets of the nominee company into itself and thus acquired the interest in the Empire State Building. Swanson Aff. (Oct. 21, 1997) ¶ 8; Plaintiffs' Pretrial Brief at 11–12; NSKK's Memo. in Support of Motion for Partial Summary Judgment at 3–4. Unless otherwise indicated, all references in this opinion to "the Empire State Building" refer to this fee interest subject to the long-term lease.

5. NSKK's Memo. In Support of Motion for Partial Summary Judgment at 4.

6. The Trump transaction was signed by Nakahara and Renoir in their capacity as managing trustees of the American Trust. Trial Transcript at 204 (Recross Examination of Swanson).

7. NSKK's Memo. In Support of Motion for Partial Summary Judgment at 4. As a result of this joint venture, the American Company owns an interest in of Trump Empire State Partners, which, since July 1994, owns the Empire State Building. Plaintiffs' Pretrial Br. at 12.

Partners, are attacked in the NSKK litigation and are central to the dispute in the Empire State litigation.

The Empire State litigation is brought by the owner of the long-term lease on the Empire State Building against plaintiffs, Trump, NSKK and certain entities within the offshore trust system. That litigation specifically attacks the offshore trust system's transfer of the Empire State Building interest into Trump Empire State Partners. It also alleges that the subsequent actions taken by Trump Empire State Partners in its ownership capacity constitute interference with and violations of the leaseholders' rights.

As previously noted, the Isle of Man Trust indirectly owns the American Trust.[8] The beneficiaries of the Isle of Man Trust are NSKK and Nakahara.[9] In the NSKK litigation, NSKK alleges that the offshore trust system should never have been created and that NSKK should be the owner of the Empire State Building or at least should be the sole beneficiary of the Isle of Man Trust.

This dispute between plaintiffs and NSKK regarding the rightful beneficiary of the Isle of Man Trust led to a hearing before an Isle of Man Court with jurisdiction over the Isle of Man Trust. At this hearing, the Isle of Man Court instructed Abacus Trust Company ("Abacus")—trustee of the Isle of Man Trust—to obtain independent counsel for the American Trust and the American Company in the New York litigations.[10] As a result, Reid & Priest LLP undertook the representation of the American Trust and the American Company in the New York litigations, with the express approval of the Isle of Man Court.[11] At the same time, the Isle of Man Court also directed Abacus and Reid & Priest to remain neutral between the two sets of beneficiaries (*i.e.*, Nakahara and NSKK) and to preserve the assets of the Isle of Man Trust and its holdings for whomever is ultimately determined to be the rightful beneficiary.[12]

In order to effect this neutrality, Abacus had plaintiffs sign an agreement dated September 12, 1995, ("standstill agreement") in which they promised not to "engage in any transactions in the [American] Trust, the [American Company], Trump Empire State Partners, [the Dutch companies], or any of their affiliates, without the prior written consent of the Abacus Trust Company as Trustee of the [Isle of Man] Trust."[13] This standstill agreement enabled Abacus to have plaintiffs to remain in place as managing trustees of the American Trust and managing directors of the American Company, without fear that plaintiffs would self-deal or otherwise act without "neutrality".[14]

In a letter dated December 10, 1996, plaintiffs made a formal request for advancement from the American Trust of the litigation expenses incurred in the New York litigations. Pursuant to § 4.2 of the American Trust's Declaration of Trust, Abacus then sought Reid & Priest's opinion, as an independent counsel, whether plaintiffs satisfied the conditions therein and were entitled to advancement.[15] Reid &

---

**8.** Pretrial Stip. ¶ 2.iii.

**9.** Pretrial Stip. ¶ 2.iv.

**10.** Until that time, the same law firm—Patterson, Belknap, Webb & Tyler LLP—represented Nakahara, Renoir, the American Trust and the American Company in the New York lawsuits. Swanson Aff. (Oct. 21, 1997) ¶ 17.

**11.** *See* Order of High Court of Justice of the Isle of Man, Chancery Division (October 26, 1995) (American Trust Trial Ex. 6). Reid & Priest is also United States counsel to the Isle of Man Trust and its trustee, Abacus Trust Company. Pretrial Stip. ¶ 2.x.

**12.** Swanson Aff. (Oct. 21, 1997) ¶¶ 14, 17; Trial Transcript at 94–95 (Direct Examination of Swanson).

**13.** Def's Trial Ex. 3, Ex. A.

**14.** Swanson Aff. (Oct. 21, 1997) ¶¶ 6–7.

**15.** Plaintiffs' Trial Ex. 8 (Letter dated Jan. 22, 1997).

Priest assigned attorney Richard P. Swanson to this project. Pursuant to § 4.2(d), Swanson reviewed all "readily available facts" and offered an opinion on May 22, 1997, expressing the view that Delaware law *required* advancement of reasonable legal expenses in this case, given the wording of the trust agreement and Delaware law.[16]

Even though Swanson provided this Opinion Letter, due to the contentious nature of the New York lawsuits, the threat of a lawsuit by NSKK against Abacus—as trustee of the Isle of Man Trust—if litigation expenses were paid over to plaintiffs, and the instruction from the Isle of Man Court that Abacus remain neutral between plaintiffs and NSKK, Abacus sought judicial approval before the American Trust advanced litigation expenses to Nakahara and Renoir.[17] Thereafter, on May 23, 1997, Abacus petitioned the court in the Isle of Man for permission to pay approximately $300,000 to two law firms—Patterson, Belknap and Markham & Read, co-counsel for Nakahara and Renoir in the New York litigations—for expenses previously incurred in connection with defending the New York lawsuits.[18] At the hearing, held on August 1, 1997, the Isle of Man Court declined to decide the advancement issue on *forum non conveniens* grounds. The Isle of Man Court concluded that the appropriate forum for this question was a state court of Delaware, because that was where the American Trust was organized.[19]

Within days of the Isle of Man hearing, on or about August 6, 1997, plaintiffs engaged in "self-help," transferring approximately $700,000 from the American Trust accounts to an account controlled by Patterson, Belknap.[20] Plaintiffs had arranged for Patterson, Belknap to distribute this money to plaintiffs' various counsel in the New York litigations. Abacus objected to these withdrawals as violations of the standstill agreement and made verbal and written demands that the money be returned.[21] Portions of the funds had already been distributed overseas, and counsel in France and the Isle of Man have refused to return the money. Currently, the balance of the $700,000 remains in the custody of Patterson, Belknap, held in escrow pending the outcome of this advancement litigation.[22]

16. Plaintiffs' Trial Ex. 14 (Letter from Swanson dated May 22, 1997) [hereinafter Opinion Letter].

17. Swanson Aff. (Oct. 21, 1997) ¶ 22.

18. Swanson Aff. (Oct. 21, 1997), ¶ 22. After conducting a "reasonableness" review of the expenses sought by plaintiffs to be advanced in connection with the New York litigations, Swanson recommended that a total of $304,-172.68 be advanced to plaintiffs by the American Trust. The entire amount was for services already rendered by Patterson, Belknap and Markham & Read in the New York litigations. Swanson Aff. (May 23, 1997) ¶¶ 24–30.

19. Swanson Aff. (Oct. 21, 1997) ¶ 24. *See also* Decl. of Trust, § 8.2 ("This Declaration shall in all respects be governed by the laws of the State of Delaware, and the rights of all parties and the validity and construction of every provision hereof shall be subject to and construed according to the laws of said state.").

20. Pretrial Stip. ¶ 2.xii. This withdrawal exceeded the scope of Swanson's opinion by approximately $400,000.

21. In a letter dated August 5, 1997—but not received by Abacus until after the withdrawal on August 6, 1997—plaintiffs purported to unilaterally terminate the September 12, 1995 standstill agreement. *See* Plaintiffs' Trial Ex. 18 (Letter from Renoir dated Aug. 5, 1997). It is unclear whether plaintiffs had the authority to unilaterally terminate the standstill agreement, whether plaintiffs were obliged to notify Abacus of the termination, and whether or not their attempted termination was successful. I do not need to reach these questions here.

22. Swanson Aff. (Oct. 21, 1997) ¶ 25. Presumably, Patterson Belknap will now return this money to the American Trust, in light of this decision. *See* Defendant's Trial Ex. 11, ex. F (Letter from John Winter dated Aug. 18, 1997). ("We [*i.e.*, Patterson, Belknap] will, of course, abide by any order of the Delaware Court relating to any advances."). That portion of the $700,000 already paid to

At about the same time, Abacus discovered that Renoir had previously withdrawn approximately $200,000 from an American Trust account on July 18 and 29, 1997—dates prior to plaintiffs' alleged termination of the standstill agreement and prior to the hearing held by the Isle of Man Court to decide Abacus' May 23, 1997 petition for permission to dispense the funds.[23] Upon making this discovery, Abacus immediately requested that plaintiffs return this money to the original American Trust account. Swanson testified at trial that the $200,000 now has been returned to its original American Trust account.[24]

Abacus, as trustee of the Isle of Man Trust, filed a petition with the Isle of Man Court in mid-to-late August 1997 apprising the court of the transfers from the American Trust account and seeking instructions regarding potential judicial remedies (i.e., whether Abacus could remove Nakahara and Renoir as managing trustees of the American Trust).[25] At a preliminary hearing on this issue, the Isle of Man Court directed plaintiffs to render an accounting by October 22, 1997 regarding the $200,000 July withdrawals and the $700,000 "self-help" withdrawal in early August.[26] A further hearing on the petition for removal was scheduled before the Isle of Man Court for December 10, 1997.[27]

Against this background, plaintiffs filed suit in the Delaware Court of Chancery seeking an order compelling the American Trust to advance plaintiffs' litigation costs related to their defense of the New York litigations.[28] Plaintiffs assert that under the terms of the American Trust's governing instrument, they are entitled to this advancement because they are parties to both of the New York lawsuits by virtue of their positions as managing trustees of the American Trust.[29]

Nominal defendant American Trust agrees that plaintiffs are entitled to have an advancement of their attorneys fees in the New York litigations, provided independent counsel determines that the fees are indeed "reasonable." [30] The American Trust has no objection to advancing plaintiffs' New York attorneys fees and maintains that it will abide by the Court's ruling. The American Trust does, however, object to plaintiffs' "self-help" withdrawal of $700,000 from the American Trust accounts to pay their counsel in the New York lawsuits.[31]

Pursuant to Court of Chancery Rule 24(a), NSKK, plaintiff in the NSKK litigation, moved to intervene in this Delaware Court of Chancery action on the ground that as a beneficiary of the Isle of Man Trust—the indirect 100% owner of the American Trust—NSKK has a stake in any further distribution of the American Trust's assets for advancement of litigation

overseas counsel appears gone forever. American Trust's Answer ¶ 24; NSKK's Answers and Counterclaims in Intervention at 9–10.

23. At trial, both Markham and Swanson testified that the $200,000 July withdrawals were actually transfers from one American Trust account to another. Trial Transcript at 58 (Direct Examination of Markham); Trial Transcript at 129–31 (Cross Examination of Swanson).

24. Id.

25. Swanson Aff. (Oct. 21, 1997) ¶ 26.

26. Swanson Aff. (Oct. 21, 1997) ¶ 28. This Court does not know whether plaintiffs have provided this accounting.

27. This hearing was postponed pending the outcome of this Delaware Court of Chancery action. Trial Transcript at 182–83 (Cross Examination of Swanson).

28. See Complaint (September 3, 1997), Docket Item 1, Amended Complaint (September 15, 1997), Docket Item 9.

29. The American Trust's Amended and Restated Declaration of Trust ("Declaration of Trust") is also the American Trust's governing instrument. Decl. of Trust, § 1.3.

30. American Trust's Answer (Sept. 24, 1997), Docket Item 15.

31. American Trust's Answer ¶ 26.

expenses.[32] Plaintiffs and the American Trust consented to NSKK's intervention.[33] On October 10, 1997, I signed an order permitting NSKK to intervene in this suit as a defendant.[34] NSKK has asserted three counterclaims in this action: (1) for an order compelling plaintiffs to return to the American Trust the $200,000 taken during the July withdrawals and the $700,000 self-help withdrawal in August,[35] (2) for an accounting, and (3) for an order removing plaintiffs as managing trustees of the American Trust.[36]

On October 29, 1997, NSKK moved for partial summary judgment[37] on the ground that, despite the advancement language contained in § 4.2(d) of the American Trust's Declaration of Trust, such language is unenforceable, contrary as it is to statutory law. According to NSKK, the Delaware Business Trust Act, while authorizing *indemnification* of litigation expenses, prohibits business trusts from *advancing* such expenses to trustees. The parties briefed this issue and argued it before the Court on November 13, 1997.

Thereafter, I wrote to counsel announcing that I intended to deny NSKK's motion for partial summary judgment and that the case would proceed to a trial on the merits. At trial on November 25, 1997, the question before the Court was whether plaintiffs are entitled to advancement of their litigation expenses in defending the New York litigations under the terms of the American Trust's Declaration of Trust and Delaware law. On December 29, 1997, I wrote counsel announcing that I was denying plaintiffs request for advancement of litigation costs in the New York litigations. The reasons for my decisions follow.

## II. MOTION FOR PARTIAL SUMMARY JUDGMENT

I do not agree with NSKK's argument that Delaware's Business Trust Act, 12 *Del.C.* §§ 3801 *et seq.*, prohibits business trusts from advancing litigation expenses to their trustees.

### A. *Parties' Contentions*

In support of its motion for partial summary judgment, NSKK argues that Delaware's Business Trust Act (the "BTA" or the "Act") does not permit business trusts to advance litigation expenses to trustees. According to NSKK, because the BTA does not expressly authorize advancement of litigation expenses to trustees, the advancement provision in the American Trust's governing instrument is unenforceable.[38] Advancement of expenses to busi-

---

**32.** NSKK's Motion to Intervene (Sept. 15, 1997), Docket Item 11.

**33.** American Trust's Answer ¶ 27. Plaintiffs purport to reserve their objections to NSKK's standing to intervene in this case. (Plaintiffs' Pre–Trial Br. at 2 n. 2.) This issue has not been pressed or argued further by plaintiffs, however, so the Court does not address it here.

**34.** *See* Order (dated October 10, 1997), Docket Item 17.

**35.** Since NSKK asserted these counterclaims, the only "unreturned" money is the $700,000 from plaintiffs' August 6 self-help withdrawal. As noted later in this Opinion, the $200,000 removed during the July withdrawals has been satisfactorily returned to the American Trust account.

**36.** NSKK's Answer and Counterclaims in Intervention at 4, Docket Item 18.

**37.** Although granting NSKK's motion would result in the dismissal of plaintiffs' entire claim, the motion is couched in terms of "partial" summary judgment, because of NSKK's counterclaims which would survive a grant of summary judgment. *See* NSKK's Memo in Support of Mot. for Partial Summary Judgment at 2 n. 1.

**38.** Section 4.2(d) of the American Trust's Declaration of Trust provides: "Expenses of preparation and presentation of a defense to any claim, action, suit, or proceedings of the character described in paragraph (a) of the Section 4.2 shall be advanced by the [American] Trust prior to final disposition thereof upon receipt of an undertaking by or on behalf of the recipient to repay such amount if it is ultimately determined that he is not entitled to indemnification under this Section 4.2."

ness fiduciaries is a creature of statute, NSKK argues, and, as such, this Court may not supplement the BTA by approving a right to make advancements not encompassed within the statute. Likewise, a business trust cannot create that right for its trustees simply by writing an advancement provision into its Declaration of Trust.[39]

Specifically, NSKK points out that whereas the BTA expressly authorizes "indemnification," it is silent with regard to "advancement."[40] NSKK contends that the General Assembly's silence in this regard is meaningful, tantamount to a prohibition by implication of advancement, under the maxim of statutory construction *"expressio unius est exclusio alterius."* As it is well-settled under Delaware law that indemnification and advancement are distinct types of legal rights,[41] and the General Assembly has previously demonstrated its ability to expressly authorize advancement in addition to indemnification,[42] NSKK argues that the BTA's failure to expressly authorize advancement, in light of its express authorization of indemnification, should be interpreted to deny advancement power to business trusts.

Plaintiffs respond that the BTA's silence with regard to advancement of expenses has no meaning and should not be construed to deprive business trusts of the right to advance litigation expenses to their trustees. Plaintiffs point to the language of 12 *Del.C.* § 3821(b)[43] for the proposition that the BTA is permissive, providing a general statutory framework within which parties are free to adopt their own specific provisions regarding their respective rights and obligations. According to plaintiffs, § 3821(b) authorizes broad freedom of contracting, subject only to the general limitations of Delaware law and the express prohibitions of the BTA. Thus, plaintiffs contend, because the BTA does not expressly prohibit advancement of expenses to trustees, the power of business trusts to make advancements is implicitly authorized.

Nominal defendant, the American Trust, assuming the position of a neutral "stakeholder" in this action, also opposes NSKK's motion for partial summary judgment because it concurs with plaintiffs' interpretation that the BTA does implicitly authorize Delaware business trusts to advance litigation expenses to their trustees.

## B. *Analysis*

As a preliminary matter, it bears emphasizing that the parties do not dispute that the American Trust's Declaration of Trust authorizes advancement of litigation expenses to its trustees under certain circumstances.[44] It is equally undisputed

---

**39.** NSKK's Reply Memo. in Support of Motion for Partial Summary Judgment at 2, 7. *See Citadel Holding Corp. v. Roven,* Del.Supr., 603 A.2d 818, 823 (1992) ("Private parties may not circumvent the legislative will simply by agreeing to do so.").

**40.** 12 *Del.C.* § 3817. The BTA, as originally enacted in 1988, contained no indemnification provision. *See* 66 Del.Laws c. 279 (1988). The General Assembly amended the BTA in 1990 to include its current indemnification provision. 67 Del.Laws c. 297, § 8 (1990).

**41.** *See, e.g., Advanced Mining Sys., Inc. v. Fricke,* Del.Ch., 623 A.2d 82, 84 (1992) ("[I]ndemnification rights and rights to advancement of possibly indemnifiable expenses [are] legally quite distinct types of legal rights.").

**42.** *See* General Corporation Law, 8 *Del.C.* §§ 145(a)–(d) (expressly authorizing corporations to indemnify officers, directors, employees, and agents); § 145(e) (expressly authorizing corporations to advance expenses to officers and directors).

**43.** "It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of governing instruments." 12 *Del.C.* § 3821(b).

**44.** The trial on the merits focused on whether, under the specific factual circumstances presented in this case, plaintiffs are entitled to advancement of their litigation expenses under the terms of the advancement provision in the governing instrument of the American Trust.

that the American Trust is governed by the BTA.[45] Thus, the question addressed in this motion for partial summary judgment is whether the advancement provision in the American Trust's governing instrument contravenes the legislative intent of the Delaware Business Trust Act, 12 *Del.C.* § 3801 *et seq.* In my opinion, it does not.

### 1. *Legal Standard*

Summary judgment is appropriate when, after reviewing the record and drawing all inferences in favor of the non-moving party, the Court finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[46] The burden is on the moving party to demonstrate that there is no dispute as to any possible issue of fact material to any valid legal theory advanced by the non-moving party.[47] Thus, if NSKK were to convince this Court that the BTA prohibits business trusts from advancing litigation expenses to their trustees, then NSKK would be entitled to judgment as a matter of law on this issue and partial summary judgment in favor of NSKK would be appropriate.

### 2. *Does the BTA prohibit advancement?*

■ When interpreting a statute, the fundamental rule is to ascertain and give effect to the intent of the Legislature.[48] The principal purpose of the BTA, originally enacted in 1988, was to statutorily recognize the existence of the business trust in Delaware, a business form that was already implicitly recognized by the statutory laws of the State.[49] Section 3817(a) of the Act provides:

> Subject to such standards and restrictions, if any, as are set forth in the governing instrument of a business trust, a business trust shall have the power to indemnify and hold harmless any trustee or beneficial owner or other person from and against any and all claims and demands whatsoever.[50]

NSKK correctly notes that this Court has previously held that indemnification and advancement are "quite distinct types of legal rights."[51] Thus, the General Assembly's authorization of "indemnification" in § 3817(a) of the BTA does not necessarily include an authorization of business trusts to advance litigation expenses to trustees. The question, therefore, becomes what was the General Assembly's intent when it omitted explicit mention of "advancement" from the provision addressing indemnification.[52]

### a. *Expressio Unius* Doctrine

■ NSKK argues that because the BTA fails to directly empower business trusts to make advancements (while the General Corporation Law expressly authorizes corporations to make advancements and the BTA expressly authorizes business trusts to *indemnify* trustees), this Court must presume that the General Assembly intended, by its silence as to advancement,

**45.** "WHEREAS it is the intention of the parties hereto that the trust declared by this Declaration constitute a business trust under the Delaware Business Trust Statute." Decl. of Trust, at 1.

**46.** *Moore v. Sizemore,* Del.Supr., 405 A.2d 679 (1979).

**47.** *Krajewski v. Blair,* Del.Ch., 297 A.2d 70, 72 (1972).

**48.** *Hudson Farms, Inc. v. McGrellis,* Del. Supr., 620 A.2d 215, 216 (1993).

**49.** 2 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations § 19.1, at 19–2 (3d ed.1998)

(citing *inter alia* 5 *Del.C.* § 101(15); 6 *Del.C.* § 1–201(28); 10 *Del.C.* § 4320(4); 19 *Del.C.* § 101(a)(4)).

**50.** 12 *Del.C.* § 3817(a).

**51.** *Advanced Mining Sys. v. Fricke,* Del.Ch., 623 A.2d 82, 84 (1992).

**52.** Although indemnification and advancement *are* distinct rights, they are related concepts that are commonly addressed in neighboring statutory provisions. *See, e.g.,* 8 *Del.C.* § 145(a)–(e).

to prohibit business trusts from making advancements. Thus, NSKK urges the Court to apply the maxim of statutory construction *"expressio unius est exclusio alterius,"* under which the expression of one thing necessarily means the exclusion of things not expressed.

Review of § 145(e) of the General Corporation Law ("GCL") reminds this Court that the Legislature that adopted the BTA knew how to expressly authorize "advancement" in addition to indemnification. Moreover, as NSKK points out, in the very same term that the Legislature added the § 3817 indemnification provision to the BTA, the General Assembly amended the advancement provisions of the GCL.[53] Thus, the specific language separately authorizing indemnification and advancement in the GCL was fresh in the legislators' minds when they omitted mention of advancement in the BTA's indemnification provision. I am not persuaded, however, that these facts lead to the conclusion that the General Assembly intended to prohibit business trusts from making advancements to their trustees. None of the cases cited by NSKK to support application of the *expressio unius* doctrine are analogous to the situation presented by the indemnification provision of the BTA. Rather, most of those cases address the interpretation of language discrepancies between different sections of a single statute or between different versions of the same statute.[54]

For example, NSKK correctly notes that whenever the Legislature enacts a provision, it is presumed to have had in mind the previous statutes relating to the same subject matter.[55] Therefore, when a provision in an earlier version of a statute is omitted from a later version, the omission is deemed intentional and conveys a meaning.[56] The Supreme Court faced this situation in *Giuricich,* when it interpreted a revision of § 226 of the GCL. Although the 1949 version had authorized the Court of Chancery to appoint a "receiver," the 1967 version authorized the Court to appoint a "custodian."[57] The Court found the 1967 alteration from "receiver" to "custodian" meaningful, because the Legislature is presumed to be aware of the precise language of the statute it is amending.[58] But the case before me is different. There is no earlier version of § 3817(a) with, for example, language granting business trusts "the power to indemnify *and advance expenses to* any trustee." If that were the situation, the current version of § 3817(a) would mean that an express authorization to make advancements had been eliminated or deleted, constituting clear evidence that the General Assembly *intended* to prohibit business trusts from making advancements. Because there is no such earlier version of § 3817(a) addressing the issue of advancement, however, I cannot accept

**53.** *See* 67 Del.Laws c. 376, § 3.

**54.** *E.g., In re Adoption of Swanson,* Del.Supr., 623 A.2d 1095 (1993) (provision expressly included in one part of statute not included in another part of same statute); *Hudson Farms, Inc. v. McGrellis,* Del.Supr., 620 A.2d 215 (1993) (comparing language of § 383 of GCL with § 117 of the Model Business Corporation Act (1960), which served as the model for § 383); *Giuricich v. Emtrol Corp.,* Del.Supr., 449 A.2d 232 (1982) (comparing earlier version of statutory provision with later, amended version of same provision); *Getty Ref. & Mktg. Co. v. Leavy,* Del.Super., 438 A.2d 1236 (1981) (using language of two sections of chapter 83 of title 9 to interpret a third section of same chapter).

**55.** *See In re Adoption of Swanson,* Del.Supr., 623 A.2d 1095 (1993) (in adding adult adoption provision to adoption statute, Legislature's failure to include certain protections found in minor adoption sections indicated intent to not require those same protections for adult adoptions).

**56.** *See Giuricich v. Emtrol Corp.,* Del.Supr., 449 A.2d 232, 239 (1982).

**57.** *Id.* at 237.

**58.** *Giuricich,* 449 A.2d at 237 (" 'Whenever a legislative body ... amends its prior enactment by a material change of language, the rule of statutory construction presumes that a change in meaning was intended.' ") (citation omitted).

NSKK's argument that *Giuricich* compels this Court to construe the Legislature's silence on the issue of advancement in the BTA to indicate an *intent* to prohibit business trusts from making them.

Emphasizing that § 145 of the GCL expressly authorizes both indemnification and advancement, NSKK also cites *expressio unius* cases standing for the proposition that when a provision expressly included in one part of a statute is not included in another part of the same statute, that means the Legislature consciously rejected the omitted provision from that part of the statute.[59] Applying this doctrine to the instant situation, however, would require drawing this inference from the language of *two different statutes*, rather than from *different provisions of the same statute*. Thus, NSKK asks this Court to adopt a rule that would require the Legislature to harmonize the language of all statutes containing provisions that grant business organizations the power to indemnify or advance litigation expenses. While the Legislature is appropriately charged with knowledge of the statutes it enacts, it is too high a burden to expect the General Assembly to maintain constant vigilance over the exact wording of all statutes addressing similar issues. Furthermore, this is not what Delaware law requires.

■ Even given the General Assembly's presumed awareness of existing law, its failure to craft language in a new statute that is identical to language addressing a similar topic in an older statute is not dispositive evidence of an intention to reject rights expressly contained in the older statute. Just such an argument failed in

*Graham v. State Farm Mutual Automobile Insurance Co.*[60] There plaintiffs argued that because the Legislature had explicitly endorsed the use of arbitration for resolving disputes arising under the State's no-fault statute, the Legislature's failure to include a similar arbitration provision in the uninsured motorist statute "demonstrate[d] a hostility to arbitration ... involving uninsured coverage."[61] The Supreme Court was not persuaded, however, and instead found that the arbitration provision in the no-fault statute was "intended to create a specialized arbitration mechanism. Since the legislature has not created a similar mechanism for the uninsured motorist statute, providers of that form of insurance are free to invoke the [provisions of the customary] Uniform Arbitration Act."[62] In the instant case, NSKK would have this Court find that the Legislature's failure to include "advancement" in the BTA's indemnification provision "demonstrates a hostility" toward advancement in the context of business trusts. Just as the Supreme Court found in *Graham*, I find it more plausible that the Legislature's failure to specifically address "advancement" in the BTA results from an understanding that the common law right of business entities to advance litigation expenses to fiduciaries would continue undisturbed.[63]

Finally, NSKK cites another line of *expressio unius* cases which draws inferences from the lack of uniformity in language when one statute serves as a model for another. For example, in *Hudson Farms*,[64] where § 117 of the Model Business Corporation Act ("MBCA") served as the model for § 383 of the GCL, the Su-

---

**59.** *In re Adoption of Swanson,* 623 A.2d 1095.

**60.** Del.Supr., 565 A.2d 908, 911 n. 3 (1989).

**61.** *Id.*

**62.** *Id.*

**63.** For another example of the General Assembly's intention that, absent express prohibition in the BTA, common law principles would apply to business trusts, consider

§ 3817(b): "The absence of a provision for indemnity in the governing instrument of a business trust shall not be construed to deprive any trustee ... of any right to indemnity which is otherwise available to such person under the laws of this State."

**64.** *Hudson Farms, Inc. v. McGrellis,* Del. Supr., 620 A.2d 215 (1993).

preme Court found meaning in the Delaware statute's slight departure from the language of the MBCA's § 117.[65] Unlike the situation in *Hudson Farms*, however, the BTA was not modeled after the GCL. While both statutes address the subject matter of business organizations, the continuity between the GCL and the BTA ends there. Had the General Assembly, in crafting the BTA, instead adopted wholesale the headings and format of the GCL—or even of the GCL's indemnification provision—I might be more persuaded that the dissimilarity between the indemnification provisions of the BTA and GCL was meaningful. With all else the same, a single difference would have more meaning. But the differences between the GCL and the BTA are simply too numerous to allow one difference to have significance. Thus, I cannot accept NSKK's argument that the doctrine of *expressio unius*, in any of its manifestations, governs interpretation of § 3817(a) of the BTA.

### b. Differences Between the BTA and the GCL

It is, in point of fact, because of the many differences between the GCL and the BTA that I am convinced the BTA's failure to mention "advancement" in

§ 3817(a) does *not* indicate an intent on the Legislature's part to prohibit business trusts from making advancements. Rather than representing a conscious departure from the language of the GCL's § 145 expressly authorizing advancement, the language of § 3817(a) of the BTA illustrates the fact that the two statutes are simply too different to draw *any* conclusions from a comparison of their various provisions. As noted above, the BTA was not modeled after the GCL. Moreover, the BTA and the GCL are different in scope, purpose and approach. The BTA simply was intended to be more flexible than the CGL. Section 3821(b) of the Act says as much: "It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of governing instruments."[66] This highly permissive language reveals a clear intent on the part of the General Assembly to grant business trusts broad freedom in establishing their internal governance mechanisms. In marked contrast, the corporate code contains no such broad directive. Though flexible in many respects, the GCL places many restrictions on how a corporation may be organized.[67]

The permissive language of § 3817(a) itself suggests that the General Assembly

---

**65.** Because § 383 of the GCL was based on § 117 of the MBCA, "the counterpart provision of the MCBA may be viewed as the foundation for the Delaware statute" in determining the Legislature's intent. *Id.* at 218 (interpreting the meaning of the Legislature's addition of the words "unless and" to the model's "until").

**66.** In addition, consider 2 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations § 19.2, at 19–6 (3d ed.1998), noting that, consistent with its stated policy of flexibility toward contracting parties, the BTA "permits a broader scope of enterprise to qualify as a 'business trust' than was possible at common law," allowing almost any trust arrangement to qualify as a business trust, whether it has corporate, partnership, *inter vivos* trust or business trust characteristics. *See also* John H. Langbein, *The Secret Life of the Trust: The Trust as an Instrument of Commerce*, 107 Yale L.J. 165, 183, 187 (1997) (Delaware's "liberal

business trust act" is popular because of its "flexibility" regarding internal governance).

**67.** For a further illustration of the relative flexibility of the business trust as a business form, see John H. Langbein, *The Secret Life of the Trust: The Trust as an Instrument of Commerce*, 107 Yale L.J. 165, 184 (1997) (" '[T]business trust eliminates a layer of regulation, i.e., the state corporation statute.' The flexibility to eliminate governance procedures that are obligatory under the corporate form has been one great attraction of the trust form. For example, the trust instrument can be drafted to dispense with routine shareholder meetings.") (citation omitted). This commentator also notes that whereas corporate law limits a company to the maximum number of shares authorized in the corporation's certificate of incorporation, the business trust instrument can be drafted to authorize an unlimited number of shares. *Id. See* 8 Del.C. § 102(4).

intended the BTA's indemnification provision to be interpreted broadly. Unlike § 145 of the GCL, which lays out express limitations on who, and then under what specific circumstances, may be indemnified by the corporation, the language of the BTA's indemnification provision is broad and flexible.[68] Such a general authorization of indemnification compels a permissive interpretation, with the language intended to authorize as much as possible and exclude only that which is expressly prohibited.

Moreover, a review of Court of Chancery opinions demonstrates that this Court has previously recognized that the GCL is interpreted strictly, while other statutes such as the Delaware Revised Uniform Limited Partnership Act ("DRULPA")[69] and the BTA are construed broadly. For example, as noted above, in *Advanced Mining*[70] the Court drew a clear distinction between the right to advancement and the right to indemnification. One year later, however, in *Delphi*,[71] the Court faced language in the DRULPA authorizing limited partnerships to "indemnify and hold harmless"—which makes no specific mention of "advancement" rights and is identical to the language in the BTA—and *assumed without discussion* that the DRULPA authorizes advancement in addition to indemnification. Surely former Chancellor Allen had not forgotten his *Advanced Mining* opinion from one year before. And surely the holding of *Advanced Mining* is still good Delaware law. Rather, the logical import of this sequence of pronouncements is that the Court of Chancery recognized the distinction that exists between Delaware's GCL on the one hand, and statutes such as the DRULPA and the BTA on the other. Namely, while the GCL is construed narrowly by the Courts, the DRULPA and the BTA were intended by the Legislature to be construed flexibly.[72] Consider the inclusion of provisions in both the DRULPA and the BTA stating a policy of "giv[ing] maximum effect to the principle of freedom of contract and to the enforceability of [governing instruments and partnership agreements]."[73] Clearly

---

**68.** *Compare* 8 *Del.C.* § 145(a) ("A corporation may indemnify any person who was or is a party or [threatened party] to any threatened, pending or completed action ... by reason of the fact that he is or was a director, officer, employee or agent of the corporation ... if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation ....") *with* 12 *Del.C.* § 3817(a) ("[A] business trust shall have the power to indemnify ... any trustee or beneficial owner or other person from and against *any and all claims and demands whatsoever*.") (emphasis added).

**69.** 6 *Del.C.* §§ 17–101 et seq.

**70.** *Advanced Mining Sys., Inc. v. Fricke*, Del. Ch., 623 A.2d 82, 84 (1992).

**71.** *Delphi Easter Partners Ltd. Partnership v. Spectacular Partners, Inc.*, Del.Ch., C.A. No. 12409, Allen, Ch., 1993 WL 328079 (Aug. 6, 1993).

**72.** Regarding DRULPA § 17–108, which is directly analogous to BTA § 3817, former Chancellor Allen wrote: "Section 17–108 is [ ] broader than the statutory indemnification provision applicable to corporations, 8 *Del.C.*

§ 145 .... In fact, Section 17–108 defers completely to the contracting parties to create and delimit rights and obligations with respect to indemnification and advancement of expenses." *Delphi Easter Partners*, at 3. *See also In re Cencom Cable Income Partners, L.P.Litig.*, Del.Ch., C.A. No. 14634, Steele, V.C., at 10–11, 1996 WL 74726 (Feb. 15, 1996) (declaring liberal rules of construction in the Limited Partnership Act); *James River–Pennington, Inc. v. CRSS Capital, Inc.*, Del. Ch., C.A. No. 13870, Steele, V.C., 1995 WL 106554 (Mar. 6, 1995) (same).

**73.** 12 *Del.C.* § 3821(b); 6 *Del.C.* § 17–1101(c). As interpreted by some commentators, § 3821(b) of the BTA, in addition to stating a policy of allowing parties broad freedom to contract in their governing instruments, authorizes those drafting the governing instrument of a business trust to "contract out" of many of the provisions of the Act. 4 ERNEST L. FOLK, III ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 3821.1, at § 3821:1 (3d ed.1996). Under this approach, even if § 3817 of the BTA did prohibit business trusts from advancing litigation expenses to trustees, under § 3821(b), the drafters of a governing instrument could "opt out" of this provision, overriding the prohibition, and

the Legislature intended to provide Delaware business trusts and limited partnerships wide latitude in the drafting of their governing instruments.

### c. Conclusion

Finally, the General Assembly added § 3801(f)(3) to the BTA in 1996 to clarify · that a governing instrument could contain any provision as long as the provision was consistent with the law and the certificate of trust.[74] This permissive approach shows clearly that the BTA was not intended by the Legislature to be viewed as an exhaustive list of options for a business trust, with anything not mentioned in the Act to be implicitly prohibited. Accordingly, I find that absent an express prohibition in the BTA, the language of § 3817 and § 3821 constitutes an implicit authorization for business trusts to do anything that is consistent with general contracting principles. This includes the right to authorize advancement of litigation expenses to business trust fiduciaries.[75]

For these reasons, I disagree with NSKK's contention that the Delaware Business Trust Act, 12 *Del.C.* §§ 3801 *et seq.*, prohibits business trusts from advancing litigation expenses to their trustees. Rather, I find that absent an express prohibition in the BTA, there is an implicit authorization for business trusts to organize themselves in any way that is consistent with general contracting principles. This includes authorizing the advancement of litigation expenses to trustees if those establishing a Delaware business trust so choose.

For all of these reasons, I find that the BTA does implicitly authorize advancement, and, therefore, deny NSKK's motion for partial summary judgment.

### III. ARE PLAINTIFFS ENTITLED TO ADVANCEMENT OF LITIGATION EXPENSES?

Having determined that the BTA does permit business trusts to provide in their governing instruments for the advancement of litigation expenses to trustees, the question for the Court becomes whether the plaintiffs in this case are entitled to such advancement. It is uncontested that the American Trust's Declaration of Trust contains advancement language. The parties dispute, however, whether such language leads to an advancement right in this case.

Following the November 25, 1997 trial on the merits, I was left to answer the following questions:

- Do the New York litigations trigger the advancement provision?
- Is Swanson "independent"?
- Did Swanson correctly interpret the instructions of Section 4.2(d)?
- Does the doctrine of unclean hands nevertheless bar plaintiffs' relief?

### A. *Parties' Contentions*

In support of their claim for advancement of litigation expenses, plaintiffs rely on § 4.2(d) of the American Trust's Declaration of Trust. That paragraph provides:

Expenses of preparation and presentation of a defense to any claim, action,

---

contractually provide for such advancement if they chose. Because I find that § 3817 does not prohibit advancement, however, I do not need to address the correctness of this interpretation.

**74.** 70 Del.Laws, c. 548, §§ 1, 2 (1996). 12 *Del.C.* § 3801(f)(3) provides that a governing instrument "[m]ay contain any provision that is not inconsistent with law or with the information contained in the certificate of trust." For further discussion on the flexibility of business trusts, particularly in terms of inter-

nal governance, see John H. Langbein, *The Secret Life of the Trust: The Trust as an Instrument of Commerce*, 107 Yale L.J. 165, 183 (1997).

**75.** *See, e.g.,* 8 *Del.C.* § 145(e) (corporations are authorized to advance litigation expenses to officers and directors); *Delphi Easter Partners Ltd. Partnership v. Spectacular Partners, Inc.,* Del.Ch., C.A. No. 12409, Allen, C., 1993 WL 328079 (Aug. 6, 1993) (limited partnerships are authorized to advance litigation expenses to partners).

suit, or proceedings of the character described in paragraph (a) of Section 4.2 shall be advanced by the [American] Trust prior to final disposition thereof upon receipt of an undertaking by or on behalf of the recipient to repay such amount if it is ultimately determined that he is not entitled to indemnification under this Section 4.2; provided, that either ... [or] an independent legal counsel in a written opinion shall determine, based upon a review of readily available facts (as opposed to a full trial-type inquiry), that there is reason to believe that the recipient will be found entitled to indemnification .[76]

As managing trustees of the American Trust, plaintiffs allege that they are entitled to advancement of their litigation costs in the New York actions because the New York litigations are "of the character described in the Declaration of Trust for which indemnification and advancement of expenses may be appropriate." [77]

NSKK contends that plaintiffs do not qualify for such advancement as described by the terms of the American Trust's Declaration of Trust. At trial, named defendant American Trust maintained a neutral position, commenting on various issues as it deemed appropriate throughout, sometimes favoring plaintiffs' argument, sometimes favoring NSKK's.

### B. *Analysis*
#### 1. *Trigger Issue*

In order for the advancement provision of the Declaration of Trust to even apply, I must first find that plaintiffs are being sued in the New York litigations "by virtue of [their] being or having been [ ] Trustee[s]" of the American Trust. NSKK asserts that the claims brought against Nakahara and Renoir in the New York lawsuits, e.g., fraud and breach of fiduciary duty to NSKK, are brought against them personally, and not in their capacity as trustees for the American Trust.[78] In addition, NSKK asserts that the allegations in the New York litigations relate to plaintiffs' conduct *prior* to formation of the American Trust. Plaintiffs, on the other hand, contend that they are clearly being sued for actions they have taken as trustees for the American Trust. In support of this, plaintiffs note that the New York litigations challenge the American Trust's handling of the Empire State Building from the moment the Trust (through its nominee E.G. Holding) purchased it. Because the American Trust is managed by its trustees, *i.e.*, Nakahara and Renoir, challenges to the transactions entered into by the American Trust necessarily challenge plaintiffs "by virtue of [their] being or having been [ ] Trustee[s]" of the Trust. Having reviewed the underlying complaints against plaintiffs in both of the New York lawsuits, I find that plaintiffs are being sued in their capacity as trustees of the American Trust and, therefore, both of the New York lawsuits trigger the application of the advancement provision of the American Trust's governing instrument.

#### a. The Empire State Litigation

■ There is no question that plaintiffs are involved in the Empire State litigation "by virtue of [their] being or having been [ ] Trustee[s]" of the American Trust. In its entirety, the Empire State litigation alleges "an illicit and reckless campaign to interfere with [ ] contractual rights .... being orchestrated by defendant Donald Trump." [79] NSKK is a co-defendant in this case, so this action involves no allegations of breach of duty to NSKK in establishing the offshore trust system. Fur-

---

**76.** Decl. of Trust, § 4.2(d).

**77.** Amended Complaint ¶ 5.

**78.** NSKK's Answer and Counterclaims in Intervention at 12.

**79.** Second Amended Complaint (Empire State Litigation) ¶ 3.

thermore, as directed at Nakahara and Renoir, the Empire State action alleges wrongdoing by the American Trust in connection with the transfer of its interest in the Empire State Building ultimately to Trump Empire State Partners. In making this allegation, the Second Amended Complaint in that action specifically identifies the defendant American Trust as being "under the control of, and the alter ego of" Nakahara and Renoir.[80] Accordingly, I find that the Empire State litigation against Nakahara and Renoir constitutes a lawsuit brought against them "by virtue of [their] being or having been [ ] Trustee[s]" of the American Trust, triggering the application of § 4.2(d).

### b. The NSKK Litigation

As for the NSKK litigation, Nakahara is accused of breaching her fiduciary duty as a director and employee of NSKK, and fraud and conversion in connection with plaintiffs' transfers of property allegedly belonging to NSKK into the offshore trust system [81] of which Nakahara is the principal beneficiary.[82] Renoir is sued in the NSKK litigation for his participation in the same alleged fraud and conversion scheme.[83] They are further accused of using their authority as trustees of the American Trust to promote the allegedly fraudulent scheme. Thus, the Third

Amended Verified Complaint in the NSKK litigation alleges wrongful activities beyond the initial transfer of property into the American Trust. It also alleges wrongdoing with respect to the Trust's subsequent transfer of its interest in the Empire State Building to Trump Empire State Partners via the American Company.[84] This transfer was accomplished by plaintiffs *as managing trustees* of the American Trust, *i.e.*, through deeds executed by Renoir "as trustee for the [] American Trust" and "as president of [the American Company] (as the stated nominee of the [] American Trust)." [85]

Even *assuming arguendo* that Nakahara and Renoir are not [being] sued *qua* trustees for the initial transfer of the Empire State Building into the American Trust, they are clearly being sued *qua* trustees for actions taken by the American Trust, such as joining with Trump to establish Trump Empire State Partners and then allowing the Trump Empire State Partners to borrow money using the Empire State Building interest as collateral. This is especially apparent in light of the relief sought by NSKK in the litigation. Contending as it does that NSKK is the rightful owner of the Empire State Building, NSKK seeks, among other things, to set aside the conveyance of the Empire State Building to Trump Empire State

---

80. Second Amended Complaint (Empire State Litigation) ¶ 10.

81. *See* note 3, *supra,* for a description of the offshore trust system.

82. Third Amended Verified Complaint (NSKK Litigation) ¶ 1. As of the trial date, the operative Complaint in the NSKK litigation was the Second Amended Verified Complaint. No final order approving the substitution of the Third Amended Verified Complaint had been entered, but Markham testified at trial that the New York court's approval was reasonably anticipated by all the parties. Trial Transcript at 22–25 (Direct Examination of Markham). *See also* Swanson Aff. (Oct. 21, 1997) ¶ 10 (stating that the 83 Third Amended Verified Complaint is the best exposition of NSKK's claims).

83. Third Amended Verified Complaint (NSKK Litigation) ¶¶ 1, 4.

84. *See* Third Amended Verified Complaint (NSKK Litigation) ¶¶ 28–39.

85. For further examples of the Third Amended Complaint's (NSKK litigation) conflation of the individuals—Nakahara and Renoir—with their roles as trustees of the American Trust, see *id.* ¶ 10 (asserting that the wholly-owned American Company is the "alter ego and mere nominee" of the American Trust); ¶ 27(c) (asserting that the American Trust "is controlled by the Renoirs"); ¶ 39 (suggesting that "the knowledge of the [American Company] and [the] American Trust" would be the knowledge of the Renoirs).

Partners.[86] The ultimate acquisition (from E.G. Holding) of the interest in the Empire State Building was effectuated by plaintiffs *qua* trustees for the American Trust, as were the subsequent transfers of that interest from the American Trust to the American Company and from the American Company to Trump Empire State Partners. Thus, again, plaintiffs are being sued "by virtue of [their] ... having been ... Trustee[s]" of the American Trust, triggering the application of § 4.2(d).

## 2. *Independence*

■ The next issue is whether or not Richard P. Swanson, of Reid & Priest, constitutes an "independent legal counsel" as required by the language of § 4.2(d)(ii). Reid & Priest became litigation counsel for the American Trust and the American Company in the New York litigations in late 1995 with the approval of the Isle of Man Court.[87] As noted earlier, Patterson, Belknap originally represented Nakahara, Renoir, the American Trust and the American Company in the New York lawsuits. Because the NSKK litigation in New York was between the two beneficiaries of the Isle of Man Trust (*i.e.*, Nakahara and Yokoii), which indirectly owns 100% of the American Trust and the American Company, the court in the Isle of Man directed the American Trust and the American Company to obtain counsel in the New York lawsuits independent of Nakahara and Renoir. Following a hearing, at which NSKK objected to the appointment of Reid & Priest on conflict of interest grounds, the High Court of Justice of the Isle of Man authorized the appointment of Reid & Priest as litigation counsel for the American Trust and the American Company in the New York litigations.[88]

Plaintiffs assert that Swanson is "independent," particularly in light of the fact that the Isle of Man Court has already declared him so. According to plaintiffs, the Isle of Man Court found the firm of Reid & Priest to be "conflict-free," despite NSKK's objections to the contrary.[89] Plaintiffs submit that "independent legal counsel" does not suggest counsel with no prior association with the Trust or the beneficiaries. Rather, plaintiffs assert that under § 4.2(d)(ii), "independent legal counsel" is similar to that in the corporate context, where corporate directors are independent when they do not appear on either side of a transaction and stand to derive no personal benefit from it.[90] According to plaintiffs, Swanson satisfies this definition.

NSKK disputes that Swanson constitutes "independent legal counsel" as required by the terms of § 4.2(d)(ii) of the American Trust's Declaration of Trust. According to NSKK, Reid & Priest cannot be "independent," because several of Reid & Priest's clients face possible exposure to NSKK in the event that NSKK prevails in its New York litigation. Two of Reid & Priest's clients—the American Trust and the American Company—are plaintiffs' co-defendants in the New York lawsuits. In addition, if NSKK were to prevail in New York, NSKK would sue another Reid & Priest client, Abacus, for its "blind" assistance in establishing plaintiffs' offshore trust system.[91] Accordingly, NSKK asserts that Reid & Priest's clients have a "vested interest" in plaintiffs' success in New York and, thus, a concomitant interest in seeing plaintiffs' defense of the New York actions well-funded, thereby render-

**86.** Third Amended Verified Complaint (NSKK Litigation) ¶ 3.

**87.** Plaintiffs' Trial Ex. 17 (Letter from Swanson dated July 22, 1997).

**88.** Order of High Court of Justice of the Isle of Man, Chancery Division (October 26, 1995) (Plaintiffs' Trial Ex. 4).

**89.** Plaintiffs' Pretrial Brief at 31.

**90.** Plaintiffs' Pretrial Brief at 33.

**91.** NSKK's Pre–Trial Memo. at 13.

ing Reid & Priest conflicted.[92] NSKK further contends that the independence question facing the Isle of Man Court was of a completely different nature than that addressed by § 4.2(d)(ii). NSKK contends that the Isle of Man Court simply ruled that Patterson, Belknap's prior representation of Reid & Priest did not disqualify Reid & Priest from representing the American Trust and the American Company in the New York litigations, where Patterson, Belknap was opposing counsel. NSKK asserts that the Isle of Man Court did not consider whether Reid & Priest was "independent" under the terms of § 4.2(d)(ii).

The American Trust's Declaration of Trust does not define the term "independent." Thus, I rely on basic "independence" concepts to determine whether Swanson is independent under the terms of § 4.2(d)(ii). I agree with plaintiffs that the concept of independence among corporate directors is useful here. For example, it is well settled under Delaware law that in a management buy-out independent outside directors are required to pass upon the entire fairness of the transaction. Inside directors are not allowed to vote on the entire fairness question, because they have an interest and are not independent. In such a situation, however, the "independent" directors are not entirely independent of the corporation—they are, after all, directors of the corporation—they simply do not have a *conflict of interest* that would taint their fair judgment.[93] This independence standard does not require the individual director to have had no prior contact with the company in order to count as "independent."

Similarly, I find that the choice of Swanson as "independent legal counsel" poses no problem under the rules of professional conduct. Although the Isle of Man Court did not interpret the term "independent" under § 4.2(d)(ii) when it issued the Order authorizing the retention of Reid & Priest as counsel for the American Trust and the American Company in the New York lawsuits, its approval is instructive in this matter, nonetheless. Despite disagreement over the exact meaning of the Isle of Man Court's approval of Reid & Priest to represent the American Trust and the American Company,[94] it is clear the parties brought to that Court's attention the potential conflict of interest due to the fact that Patterson, Belknap had represented Reid & Priest on two prior occasions. Thus the Court's Order implicitly holds that the prior contact between Reid & Priest and Patterson, Belknap posed no danger to the parties in the New York litigations. Because the Isle of Man Court itself had earlier instructed the American Trust and the American Company to obtain New York counsel independent of Nakahara and Renoir, however, it is safe to assume that the Court also found Reid & Priest—with respect to the firm's ongoing representation of the Isle of Man Trust, Abacus, the American Trust and the American Company—independent of any influence from Nakahara and Renoir, with no conflicts of interest precluding it from zealously representing the American Trust and the American Company. In addition,

---

**92.** *Id.* at 14.

**93.** *See, e.g., Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345 (1993) (director is independent who does not appear on both sides of transaction being considered, who derives no personal financial benefit from transaction, and whose decision is based entirely on the merits of the transaction influenced by neither personal nor extraneous considerations); *Benerofe v. Cha,* Del.Ch., C.A. No. 14614, Chandler, V.C., 1996 WL 535405 (Sept. 12, 1996) ("A director is 'independent' if that director is capable of making

decisions for the corporation based on the merits of the subject rather than 'extraneous considerations or influences.' ") (quoting *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 816 (1984)).

**94.** Swanson testified at trial that proceedings in the Isle of Man Court are not routinely transcribed. Thus, there is no hearing transcript to show exactly what arguments were made to that Court. Trial Transcript at 95 (Direct Examination of Swanson).

Swanson receives instructions from Abacus, who is not even a party to the New York litigations.[95]

Moreover, I am not persuaded by NSKK's suggestion that Reid & Priest suffers a conflict of interest because several of its clients face possible exposure to NSKK in the New York litigations.[96] The fact that Reid & Priest is litigation counsel for the American Company and the American Trust does not diminish its "independence" in this respect. The fact of its allegiance to the American Trust, by virtue of Reid & Priest's position as litigation counsel to the Trust in the New York lawsuits, simply means that Reid & Priest has the Trust's best interests in mind. It is my belief that the term "independent" in § 4.2(d)(ii) means independent of the managing trustees seeking the advancements and independent of any other interested parties who oppose such advancement. Because the advancement decision is to be made by the American Trust itself and a decision that has direct consequences to the American Trust—because it decides whether to disperse money from the American Trust accounts—it would be unreasonable for the term "independent" to mean free of allegiance to the American Trust itself.

Finally, while the selection of "independent legal counsel" might conceivably have been accomplished in a way to put the choice beyond question, it is clear from the facts that Swanson has acted independently. He has dealt even-handedly with the opposing parties in the New York lawsuits and has maintained "neutrality" throughout his role as "independent legal counsel." Over plaintiffs' objections, Swanson invited NSKK to provide evidence tending to support the denial of advancement, allowing them five months in which to produce the

materials. As a result of his review of the plaintiffs' expense reports for "reasonableness," Swanson recommended the American Trust advance significantly less than the amounts requested by plaintiffs. And despite his own opinion that plaintiffs are clearly entitled to the advancement they seek, Swanson has refused to authorize payment of any advance without court approval. Furthermore, when the American Trust learned of plaintiffs' self-help remedy of the July and August withdrawals, Swanson insisted that plaintiffs return the funds to the Trust, and then assisted Abacus in the petition to the Isle of Man Court to remove plaintiffs as trustees of the American Trust. Finally, the fact that both plaintiffs and NSKK warmly contest various decisions Swanson has made is a good indication that Swanson has acted entirely independently, treating neither side more favorably than the other.[97]

Delaware law does not require that otherwise "independent" counsel be brand new to the scene, with no prior contact to any party or to any relevant facts. Delaware law only requires that there be no disqualifying conflict of interest. I find that there is none here. Accordingly, I conclude that Reid & Priest, and Swanson in particular, are independent in satisfaction of § 4.2(d)'s "independent legal counsel" requirement.

### 3. Section 4.2 Interpretation

Having found that Swanson is independent as contemplated by the American Trust's Declaration of Trust, I turn to whether or not Swanson's interpretation of § 4.2(d) satisfies the inquiry required by that provision. The relevant language of § 4.2(d) states:

Expenses and preparation of a defense to any claim ... *shall* be advanced by the [American] Trust prior to final dis-

---

95. Trial Transcript at 197 (Recross Examination of Swanson).

96. NSKK's argument that Abacus faces potential liability (*i.e.,* of having its actions in connection with creating the offshore trust system questioned) in the event that Nakahara

and Renoir lose in the New York litigation is simply too attenuated to warrant serious consideration at this point.

97. Swanson Aff. (Oct. 21, 1997) ¶ 18.

position thereof ...; provided either ...; or

(ii) ... or an independent legal counsel in a written opinion shall determine, based upon a review of readily available facts ... that there is *reason to believe* that the recipient *ultimately will be found entitled to indemnification.*[98]

NSKK contends that Swanson misinterpreted the instructions of § 4.2(d) in deciding that plaintiffs have a right to advancement from the American Trust. Swanson testified at trial that he understood the language of § 4.2(d)(ii) to require—*"shall be advanced"*—advancement of the New York litigation expenses, if he determined that "there [wa]s reason to believe" plaintiffs would ultimately be entitled to indemnification. According to Swanson, this meant that if he determined plaintiffs *might* ultimately be entitled to indemnification in the New York actions, then the American Trust was obligated to advance plaintiffs their New York litigation expenses.

Under the American Trust's Declaration of Trust, a trustee is entitled to *mandatory* indemnification unless it is determined upon final adjudication or determination by a court or entity approving a settlement agreement that the trustee engaged in willful misfeasance, bad faith, gross negligence or reckless disregard of his duties in the conduct of his duties as a trustee.[99] After considering Delaware law and making "a review of readily available facts," Swanson determined that it was impossible to predict the outcome of the New York litigations. Thus, Swanson reasoned, plaintiffs might very well ultimately be entitled to indemnification. To Swanson, this state of uncertainty regarding the outcome of the New York litigations constituted "reason to believe that [plaintiffs] ultimately will be found entitled to indemnification." Consequently, according to Swanson's interpretation of § 4.2(d)(ii) and Delaware law, the American Trust is obligated to make the advancements to plaintiffs.[100]

NSKK, on the other hand, interprets the language of § 4.2(d)(ii) to require the independent legal counsel to make a legal determination that the parties seeking advancement *"will* be entitled to indemnity." [101] According to this interpretation, Swanson's determination that plaintiffs *might* ultimately be entitled to indemnification from the American Trust automatically causes plaintiffs' claim for advancement to fail.[102]

▇ I agree that the language of § 4.2(d)(ii) is potentially ambiguous. It is my opinion, however, that the interpretation that does the least injury to the words embodied there is the one actually chosen by Swanson in making his determination.

---

**98.** Decl. of Trust, § 4.2(d) (emphasis added).

**99.** Decl. of Trust, § 4.2(a), (b).

**100.** *See* Opinion Letter at 12 (Plaintiffs' Trial Ex. 14).

**101.** NSKK's Pre–Trial Memo. at 16–17.

**102.** NSKK further argues that Swanson misunderstood the relevant legal principles in rendering his decision on plaintiffs' ultimate entitlement to indemnification. According to NSKK, Swanson's consideration of the merits in the underlying New York litigations was flawed because he did not take into account New York law holding that gifts from an older family member to a younger family member are presumptively fraudulent. This presumption of fraud switches the burden of establishing that the transaction was fair to Nakahara and Renoir, *i.e.*, to those wishing to benefit from the transaction, so that the burden is reversed from the way Swanson viewed it. *See* NSKK's Pre–Trial Memo. at 17–18 (citing, *e.g.*, *United States v. McCombs*, 30 F.3d 310, 325 (2d Cir.1994); *Thaw v. Thaw*, 27 F.2d 729, 733 (2d Cir.1928)). NSKK argues that a proper understanding of the burden of proof tips the ultimate indemnification balance *against* plaintiffs, and thus, causes their claim for advancement to fail under § 4.2(d)(ii). I have considered this argument and am not convinced that the cases cited by NSKK require me to reverse the traditional placement of the burden of proof in the instant circumstance. Thus, I do not agree with NSKK that Swanson's "ultimate indemnification" determination was in any way flawed.

The words "reason to believe ... will ultimately be entitled" mean some legitimate claim to ultimate indemnity, which means some legitimate chance of prevailing in the New York litigations. The words do- not require the independent legal counsel to believe that plaintiffs are almost certain to prevail in the New York actions; nor do the words allow advancement if it seems likely to the independent legal counsel that plaintiffs will not prevail in New York. Swanson could not determine who would ultimately prevail in the New York litigations. This uncertainty constituted the requisite "reason to believe" in Swanson's mind—the "independent legal counsel"—and thus advancement is proper in this situation.[103]

### 4. *Unclean Hands*

Even if this Court finds, as it does, that plaintiffs are entitled to advancement of their litigation expenses pursuant to § 4 .2(d) of the American Trust's Declaration of Trust, NSKK contends the doctrine of unclean hands defeats plaintiffs' entitlement in this case. NSKK alleges that plaintiffs' July and August withdrawals from the American Trust accounts constitute the very sort of inequitable conduct that should bar plaintiffs from obtaining the equitable relief they now seek. According to NSKK, these withdrawals were accomplished in knowing violation of both the standstill agreement and either a petition pending before the Isle of Man Court or an Order of that Court directing the parties to petition the Delaware Court of Chancery. Following this logic, NSKK alleges, this Court of Chancery action for advancement brought by plaintiffs essentially seeks an *ex post facto* judicial ratification of their improper July and August withdrawals—withdrawals euphemistically titled "self-help" by plaintiffs. Having already surreptitiously removed approximately $900,000 from the American Trust accounts (with $700,000 still outstanding), plaintiffs now seek this Court's imprimatur on their earlier withdrawals plus permission to remove additional monies in the future.

Plaintiffs, who admit that they made the July and August withdrawals under questionable circumstances, contend that there was nevertheless no harm to the American Trust (or hence to NSKK's interests as a beneficiary of the parent trust entity) because Swanson—the "independent legal counsel"—had already concluded, pursuant to the requirements of § 4.2, that plaintiffs were entitled to advancement. This amounts to the familiar "no harm, no foul" argument.[104] Because independent legal counsel had already determined that the money was owed them, plaintiffs assert that their July and August withdrawals constitute simple acts of self-help, which should not now bar their recovery of further advancement in this action.

Although this Court finds that plaintiffs have satisfied all the contractual conditions prerequisite to obtaining advancement under Section 4.2(d), I cannot in good conscience authorize these plaintiffs to receive such advancements. The reason: plaintiffs come to the Court with unclean hands.

 It is a fundamental principle of equity that "[he] who comes into equity must do so with clean hands." [105] Thus, a "litigant who engages in reprehensible conduct in relation to the matter in controversy ... forfeits his right to have the

**103.** Swanson Aff. (Oct. 21, 1997) ¶¶ 19, 21.

**104.** *See* Trial Transcript at 218–219 (Closing Argument of McNally) ("First, there is a standstill agreement that my clients probably did not in every particular honor.... There hasn't been any harm to the [American Trust] about any money that's been taken out of the trust. It's either been put back or the trust owes [plaintiffs' New York counsel] more than the amount of money that was taken.... So there hasn't been any harm to the trust.... It's not a reason to deny advancement under the circumstances here.").

**105.** *Kousi v. Sugahara*, Del.Ch., C.A. No. 11556, at 3, Jacobs, V.C., 1991 WL 248408 (Nov. 21, 1991).

court hear his claim, regardless of its merit." [106] I find that plaintiffs in this case approach the Court with unclean hands for two reasons: (1) their violations of the standstill agreement, and (2) their utter disregard of ongoing judicial proceedings, in that they brought about the $200,000 transfer while Abacus' petition was pending before the Isle of Man Court and then withdrew the $700,000—under the guise of "self-help"—at a time when, based on the August 1 *forum non conveniens* ruling of the Isle of Man Court, they should have expected the advancement issue to be litigated in a Delaware Court. In order for the doctrine of unclean hands to bar a plaintiff's recovery, though, the conduct that renders a plaintiff's hands "unclean" must also relate directly to the matter in controversy.[107] As these withdrawals were accomplished for the sole purpose of funding plaintiffs' New York defenses—the very reason plaintiffs have brought this advancement action to the Delaware Court of Chancery—plaintiffs' inequitable conduct clearly has the "immediate and necessary" relation to the claims for which plaintiffs seek relief.[108] Plaintiffs' misconduct, therefore, bars them from obtaining the equitable relief they now seek, *i.e.*, advancement of their litigation expenses in the New York lawsuits.

### a. Standstill Agreement

First, the September 12, 1995 standstill agreement provides, in pertinent part, that Nakahara and Renoir are bound not to "engage in any transactions in the [American] Trust, the [American Company], Trump Empire State Partners, [the Dutch companies], or any of their affiliates, *without the prior written consent of the Abacus Trust Company as Trustee of the [American] Trust.*" [109] It is uncontroverted that the July withdrawals violated this agreement.[110] Moreover, although plaintiffs purportedly made the August 6 "self-help" withdrawal *after* unilaterally terminating the standstill agreement, they clearly timed the notification so that the American Trust's counsel would not learn of the withdrawal until it was too late to prevent it.[111] The testimony at trial makes it clear that plaintiffs' "self-help" occurred without notice to or prior approval from Abacus or its counsel, and before Abacus, or its counsel, or NSKK could have reasonably known of the attempted termination. Putting aside the question whether plaintiffs even had the authority to unilaterally terminate the standstill agreement, given the timing of the facsimile transmission and the time zone difference involved, by the time Abacus received notification of the plaintiffs' "termination," the approximately $700,000 had already been withdrawn.

Swanson, who issued the opinion that plaintiffs were entitled to advancement, testified that the July and August withdrawals constituted dishonest self-dealing by the plaintiffs, and were made in bad faith in violation of the standstill agree-

---

**106.** *In re Enstar Corp.*, Del.Ch., 593 A.2d 543, 553 (1991).

**107.** *Walter v. Walter*, Del.Supr., 136 A.2d 202 (1957). *See also Delaware Surety Co. v. Layton*, Del.Ch., 50 A. 378 (1901) (rejecting "unclean hands" argument because conduct and subject-matter of the suit not sufficiently connected).

**108.** *Kousi v. Sugahara*, Del.Ch., C.A. No. 11556, at 4, Jacobs, V.C., 1991 WL 248408 (Nov. 21, 1991).

**109.** American Trust Trial Ex. 11, Ex. A (emphasis added).

**110.** As noted earlier, Markham explained at trial that the July withdrawals were really transfers of $200,000 from one American Trust account to another. Nevertheless, such transfers constituted "engaging in transactions on behalf of the American Trust," in direct violation of the standstill agreement. Trial Transcript at 129–31 (Cross Examination of Swanson) ("Q: So the transfer of money from one trust account to another trust account violated the standstill agreement? A: Yes.").

**111.** Swanson Aff. (Aug. 21, 1997), ¶¶ 4–5; Trial Transcript at 126–28 (Cross Examination of Swanson).

ment.[112] Objecting to the "self-help" engaged in by plaintiffs, counsel for the American Trust, too, stated unequivocally at trial that the withdrawals were entirely improper and made in bad faith.[113] Thus, plaintiffs' July and August withdrawals were made in violation of the standstill agreement and in bad faith, rendering plaintiffs' hands "unclean" with respect to the judicial approval they now seek of their right to advancement.[114]

### b. Pending Court Proceedings

Second, it is clear that plaintiffs accomplished the July and August withdrawals in a manner designed to preempt any judicial determination regarding Abacus' authority to make the requested advancements. Abacus had filed a petition with the Isle of Man Court on May 23, 1997, seeking permission to advance $300,000 in litigation expenses to plaintiffs' counsel in the New York lawsuits. The hearing on this petition was not held until August 1, 1997. In the interim, on July 18 and 29, Renoir surreptitiously withdrew approximately $200,000 from an American Trust account.[115] While these July withdrawals may not have been in direct defiance of pending court proceedings—as the money was not actually paid out to plaintiffs' New York counsel—the transfers moved the $200,000 to an account over which plaintiffs had more control, very possibly in preparation for making "self-help" payments to their New York counsel.[116]

Plaintiffs' more egregiously defiant act, though, was the August 6 "self-help" withdrawal of $700,000 from the American Trust accounts. Following the Isle of Man Court's August 1 ruling on *forum non conveniens* grounds, plaintiffs surely anticipated that Abacus would renew its request in another forum for permission to advance plaintiffs' litigation costs.[117] Thus, although plaintiffs withdrew the $700,000 before the complaint was actually filed in this Court of Chancery action,[118] based on the proceedings in the Isle of Man Court and Abacus' avowal that it would not advance plaintiffs' litigation expenses without

---

**112.** Trial Transcript at 131–35 (Cross Examination of Swanson). *See also* Trial Transcript at 126–28 (Cross Examination of Swanson) ("It's clearly my view, whether or not they had the right to terminate the agreement and whether or not they terminated it validly, the agreement was in place at the time they took the money, and it was a breach of the agreement.").

**113.** American Trust's Answer ¶ 26; Trial Transcript at 225–27 (Closing Argument of Jenkins) ("When something is undergoing judicial proceedings, it ought not to be subject to self-help by a party, especially [the] sneaky kind of self-help, designed to prevent a TRO. *It was wrong. It was actionable self-dealing. I have no doubt about that . . . . We think it was entirely improper.*") (emphasis added).

**114.** Plaintiffs had violated the standstill agreement on at least two prior occasions. The first violation was in connection with certain transactions involving a French chateau (at issue in the NSKK litigation), the second in connection with securing $800,000 bail for Nakahara. Swanson Aff. (Aug. 21, 1997), ¶ 18.

**115.** Indeed, according to NSKK, plaintiffs' advocate at the August 1 hearing before the Isle of Man Court "represented in open court that his clients had undertaken not to take any steps in relation to management of the American Trust without the prior written consent of Abacus." NSKK's Answer and Counterclaims in Intervention at 8.

**116.** Trial Transcript at 129–30 (Cross Examination of Swanson).

**117.** It is unclear what was the exact ruling given by the Isle of Man Court at the conclusion of this August 1 hearing. Markham testified at trial that the Court simply declined jurisdiction on *forum non conveniens* grounds, without suggesting that the Trust *had* to ask any court's permission to make the advancements. NSKK argues, on the other hand, that the Court directed the Isle of Man Trust to seek approval from the Delaware Court of Chancery before making any advancements. NSKK's Pre–Trial Memo. at 1. At the very least, it was apparent that Abacus' resolve not to make any advancements without prior judicial approval had not diminished.

**118.** Plaintiffs filed the initial complaint on September 3, 1997.

prior court approval, plaintiffs had more than a passing expectation that such an action would be filed, whether by Abacus or by themselves.[119] Moreover, the stated purpose of this August "self-help" withdrawal was to pay plaintiffs' New York litigation expenses, the exact purpose for which Abacus had initially sought permission from the Isle of Man Court to make payments to Nakahara and Renoir.[120]

This Court is convinced that plaintiffs' August 6 "self-help" withdrawal—made a mere five days after the Isle of Man's *forum non conveniens* ruling and in the face of imminent litigation in the Delaware Court of Chancery—was made in bad faith and effected in a way intended to hide the transaction until it was too late to be undone, or prevented for that matter. Once a new petition was filed, plaintiffs would have been prevented by law from withdrawing the funds while the case was pending. Accomplished during an interim period in which no suit regarding the authority of the American Trust to advance litigation expenses to plaintiffs was actually pending, the $700,000 withdrawal clearly violated the spirit of the Isle of Man Court's ruling as well as the expectations of the parties involved.[121] In fact, the July and August withdrawals prompted Abacus, as trustee for the Isle of Man Trust, to petition the Isle of Man Court on August 26, 1997, for permission to remove Nakahara and Renoir as managing trustees of the American Trust.[122]

Plaintiffs assert that, whatever their actions with regard to the July and August withdrawals, they are nevertheless entitled to advancement in this case because their actions did not harm the trust in any way. Again, plaintiffs point to the fact that an independent legal counsel had already determined that plaintiffs are entitled to advancement under the terms of the American Trust's Declaration of Trust. Because this Court concludes that, under the terms of § 4.2, plaintiffs are entitled to advancement, on the surface this "no harm, no foul" argument is appealing. Concluding that plaintiffs have a right to this advancement, however, does not change the fact that plaintiffs violated the standstill agreement and the spirit, if not the letter, of the Isle of Man Court's instructions. The key issue here is not for NSKK to show that the American Trust has been harmed. Rather, in this action for advancement, plaintiffs are asking a court of equity to grant them equitable relief. But, plaintiffs withdrew the $200,000 and $700,000 wrongfully, without permission, and surreptitiously. A court of equity will not use its equitable powers to condone such activity. Equity does not reward those who act inequitably, even if it can be said that no tangible injury resulted. To paraphrase a century-old United States Supreme Court opinion, plaintiffs' conduct in making the July and August withdrawals deserves *condemnation, not commendation.*[123] As that Court has further stated:

> [a] court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses, and

---

119. In the end, of course, it was Nakahara and Renoir who filed suit in this Court, seeking an order compelling the American Trust to advance them their expenses in the New York lawsuits.

120. Indeed, as noted earlier, in their August 6 "self-help" withdrawal, plaintiffs withdrew more than twice the amount Abacus was then proposing to advance to them. *See* note 20, *supra.* The fact that they withdrew $700,000 indicates an intent, not to engage in judicially-recognized "self-help," but rather to make an end-run on the judicial process itself.

121. Trial Transcript at 131–35 (Cross Examination of Swanson).

122. The Isle of Man Court adjourned that hearing pending the outcome of this advancement action.

123. *Deweese v. Reinhard,* 165 U.S. 386, 17 S.Ct. 340, 341, 41 L.Ed. 757 (1897) (denying plaintiff's request for relief because of plaintiff's inequitable conduct).

whatever use he may make of them in a court of law, he will be held remediless in a court of equity.[124]

Despite plaintiffs' technical satisfaction of the terms of § 4.2 of the American Trust's governing instrument, I find that because of their inequitable conduct with regard to the very money they now seek through this advancement action, plaintiffs may not invoke the equitable arm of this Court to compel those distributions. Thus, because of plaintiffs' underhanded tactics with regard to the July and August withdrawals, I find that they are *not* entitled to advancement of the litigation expenses incurred in their defense of the New York lawsuits.[125]

I do not mean to suggest that plaintiffs will not ultimately be entitled to indemnification of their costs incurred with respect to the New York litigations. My determination that plaintiffs are not entitled to *advancement* has no bearing on plaintiffs' ability to seek and obtain *indemnification*. As this Court stated in *Advanced Mining*, advancement and indemnification are entirely distinct types of legal rights, and entitlement to one does not necessarily entail entitlement to the other.[126] The converse is also true. Lack of entitlement to advancement does not necessarily entail lack of entitlement to ultimate indemnification. This Court, of course, makes no judgment on that question.

For the reasons stated above, I find in favor of NSKK,[127] and deny plaintiffs' request for advancement of their litigation costs in connection with the New York litigations.[128]

**IT IS SO ORDERED.**

---

**124.** *Id.*

**125.** Because I am denying plaintiffs' request for advancement, I need not address the issue of the reasonableness of the costs.

**126.** *See Advanced Mining Sys., Inc. v. Fricke,* Del.Ch., 623 A.2d 82, 84 (1992).

**127.** I need not reach two of NSKK's counterclaims: (1) NSKK seeks an accounting "as to all monies withdrawn by [plaintiffs] as purported advancements for their litigation expenses, as well as monies transferred by them to third parties in violation ... of the Declaration [of Trust] and the standstill agreement, and exceeding the scope of counsel opinion dated on or about May 23, 1997." NSKK's Answer and Counterclaims in Intervention at 14. At a hearing on this issue, the Isle of Man Court directed plaintiffs to render an accounting for the $900,000 by October 22, 1997. This accounting has either already been provided or will be shortly. To the extent NSKK seeks a broader accounting, one of NSKK's claims in the NSKK litigation in New York is for an accounting. Thus, either in the Isle of Man or in New York, there is a prior action pending with respect to NSKK's request for an accounting. (2) Regarding NSKK's counterclaim for the removal of Nakahara and Renoir as managing trustees of the American

Trust, Abacus has already filed a petition seeking similar relief from the Isle of Man Court. Swanson Aff. (Oct. 21, 1997) ¶¶ 28–29. Thus, regarding this counterclaim too, there is a prior action pending—one in which NSKK is a party—raising the same issues and seeking the same relief. Accordingly, these claims are stayed in this Court pending decisions in the New York and Isle of Man Courts.

**128.** Plaintiffs argue that NSKK's counterclaim for an order compelling the return of the $700,000 already withdrawn by plaintiffs—without any court's blessing and in violation of the standstill agreement—should be denied because NSKK made the same request to the New York Supreme Court which denied it. *See* Plaintiffs' Pretrial Br. at 2. In addition, that part of the $700,000 distributed to overseas counsel does appear lost forever. As noted earlier, however, Patterson, Belknap has expressly declared that it would hold that portion of the $700,000 it received in escrow pending this Court's decision in this advancement action. *See* American Trust's Trial Ex. 11, ex. F (Letter from John Winter dated Aug. 18, 1997) ("We will, of course, abide by any order of the Delaware Court relating to any advances."). Presumably, Patterson, Belknap will now return this money to the American Trust, in light of my decision that plaintiffs are not entitled to advancement.

OFFSHORE TRUST SYSTEM

NS 1991 Trust/Isle of Man Trust
(an Isle of Man Trust)

|
100% owner of
↓

ESB Real Estate N.V.
(a Dutch Antilles Company)

|
100% owner of
↓

ESBAP B.V.
(a Dutch Company)

|
100% owner of
↓

NS 1991 American Trust/American Trust
(a Delaware Business Trust)

acquired assets of nominee,
E.G. Holding Company
(a Delaware Corporation),
including the
Empire State Building

|
100% owner of
↓

NS 1999 American Company Ltd./American Company
(a Delaware Corporation)

|
owns an interest in
↓

Trump Empire State Partners
(a New York General Partnership)

|
holds title to Empire State Building
(as of July 1994)

**Appendix A**