# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARC GLOBAL INVESTMENTS II, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2024-0186-LWW |
| DIGITAL WORLD ACQUISITION CORP., ERIC S. SWIDER, FRANK J. ANDREWS, EDWARD J. PREBLE, AND JEFFREY A. SMITH | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 29, 2024
Date Decided: September 16, 2024

Matthew D. Perri, Daniel E. Kaprow, Elizabeth J. Freud, Alfred P. Dillione & Rae Ra, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Plaintiff ARC Global Investments II, LLC*

Kevin M. Coen & Jacob M. Perrone, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Bradley J. Bondi, D. Scott Carlton, Traci Zeller & Nicholas J. Griepsma, PAUL HASTINGS LLP, Washington, D.C.; *Counsel for Defendants Digital World Acquisition Corp., Eric S. Swider, Frank J. Andrews, Edward J. Preble, and Jeffrey A. Smith*

**WILL, Vice Chancellor**

ARC Global Investments II, LLC was the sponsor of Digital World Acquisition Company (DWAC), a special purpose acquisition company. Early on, ARC purchased founder shares of DWAC Class B common stock that would represent 20% of DWAC's outstanding shares after its initial public offering. Units purchased in DWAC's initial public offering and through private placement included one share of Class A common stock per unit and one half of a warrant.

DWAC's certificate of incorporation provided that at the closing of a business combination, shares of Class B common stock would automatically convert into shares of Class A common stock at a minimum ratio of 1:1. This would allow the Class B stockholders to retain their approximate 20% stake, excluding shares issued to any seller in the business combination. The certificate of incorporation also provided that if shares of Class A stock were issued or deemed issued in excess of the amount sold in the IPO, a different conversion ratio formula would apply. This formula acted as an anti-dilution provision in favor of Class B stockholders. With certain exclusions, Class B stockholders were essentially provided with one Class A share for every four Class A shares otherwise issued or issuable.

There is no dispute that the conversion ratio formula was triggered since DWAC issued additional Class A shares post-IPO. The parties agree that the denominator of the ratio reflects the number of Class B common shares outstanding at the time of DWAC's business combination with Trump Media & Technology

1

Group Corp. They disagree on whether DWAC properly calculated the numerator to the conversion ratio, which is more complicated. DWAC maintains that the proper ratio is 1.3481:1. ARC insists that it should be 1.8178:1.

In the decision that follows, I interpret DWAC's certificate of incorporation to determine the correct conversion ratio. I consider the parties' disagreements on Class A common shares that were issued or issuable in connection with several categories of securities. I agree with ARC on some inputs, with the defendants on others, and set the conversion ratio at 1.4911:1.

What should have been a straightforward exercise in contract interpretation and math was obscured by the parties' injection of other issues. ARC claims that the members of DWAC's board of directors calculated the conversion ratio and made related disclosures in bad faith out of personal animus for ARC's founder Patrick Orlando. In response, the defendants raise a series of affirmative defenses concerning unrelated and purported misconduct by Orlando. I reject these diversions as meritless, irrelevant, or untimely.

ARC has prevailed on aspects of its breach of contract claim. It is entitled to an order of specific performance and related declaratory relief. It did not, however, prove its breach of fiduciary duty claims. Judgment is entered for ARC in part and for the defendants in part.

2

## I.  BACKGROUND

The facts described below were proven by a preponderance of the evidence at trial or stipulated to by the parties.[1]

### A.  Digital World Acquisition Company and its Sponsor

Defendant Digital World Acquisition Corp. was formed as a Delaware corporation on December 11, 2020.[2]  As a SPAC, DWAC's ultimate purpose was to effect a business combination.[3]

Plaintiff ARC Global Investments II, LLC, a Delaware limited liability company, was DWAC's sponsor.[4]  In early 2021, ARC purchased founder shares of DWAC Class B Common Stock.[5]  These founder shares were to represent 20% of the total shares outstanding after DWAC completed its initial public offering.[6]

---

[1] *See* Stipulation and Second Am. Pre-trial Order (Dkt. 182) ("PTO").  Exhibits jointly submitted by the parties at trial are cited according to the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined.  Unless otherwise noted, pin cites are to the pagination stamped in labeling joint exhibits.  Deposition transcripts are cited as "[Last Name] Dep. __."

[2] PTO ¶ 13.

[3] PTO ¶ 6; *see* JX 2 at 3; Swider Dep. 9.

[4] PTO ¶ 5.

[5] *Id.*  After a stock split and return of shares to DWAC, these amounted to 5,490,000 shares at the time of the business combination discussed below.  *Id.*

[6] JX 2 at 21.

Patrick Orlando purports to be ARC's managing member.[7] He also claims to be its controlling member.[8] He previously served as a director and the Chairman and Chief Executive Officer of DWAC.[9]

**B.    The Initial Public Offering**

In preparation for its initial public offering, DWAC filed an amended and restated certificate of incorporation (the "Charter") with the Delaware Secretary of State.[10] The Charter authorized 210,000,000 shares of Common Stock, consisting of 200,000,000 shares of Class A Common Stock and 10,000,000 shares of Class B Common Stock.[11]

DWAC's initial public offering occurred in September 2021. DWAC sold 25,000,000 units at $10 per unit. Another 3,750,000 units were sold for $10 per unit in a secondary public offering.[12] Each IPO unit consisted of one share of DWAC Class A Common Stock and one half of a redeemable warrant.[13] Each whole warrant

---

[7] PTO ¶ 47; *see Leon v. Orlando*, C.A. No. 2024-0311-LWW (Del. Ch.).

[8] PTO ¶ 12.

[9] *Id.*

[10] JX 40 ("Charter").

[11] PTO ¶ 16; Charter § 4.3.

[12] PTO ¶ 18; JX 201.

[13] PTO ¶ 15.

4

provided holder with the right to purchase an additional share of Class A Common Stock.[14]

DWAC also issued 1,133,484 private placement units to ARC.[15] Each private placement unit consisted of one share of Class A Common Stock and one half of one warrant.[16]

## C.    The Conversion Ratio

The Charter explains that upon the closing of a business combination, shares of Class B Common Stock would automatically convert into shares of Class A Common Stock.[17] Section 4.3(b) of the Charter sets the ratio at which Class B Common Stock would be converted into Class A Common Stock at a minimum of "a one-for-one basis."[18] If "additional shares of Class A Common Stock, or Equity-linked Securities . . . [we]re issued or deemed issued in excess of the amounts sold in [DWAC]'s initial public offering of securities," a different conversion ratio in Section 4.3(b)(ii) of the Charter (the "Conversion Ratio") was triggered.[19]

---

[14] *Id.*

[15] JX 200 ("Proxy Statement") at 4.  All citations to the Proxy Statement follow its internal pagination rather than the joint exhibit pagination.

[16] *Id.*

[17] PTO ¶ 16; Charter § 4.3.

[18] Charter § 4.3(b)(i).

[19] *Id.* § 4.3(b)(ii); *see infra* note 93 and accompanying text (discussing the definition of "Equity-linked Securities").

The denominator for the Conversion Ratio is static. It is the "number of shares of Class B Common Stock issued and outstanding prior to the closing of the initial Business Combination."[20] The relevant figure is 7,158,025.[21]

The numerator is more complicated. Section 4.3(b)(ii) of the Charter outlines a mathematical formula to calculate it. The formula proceeds in several steps.

First, the formula considers the "shares of Class A Common Stock issued or issuable" by DWAC "upon the conversion or exercise of any Equity-linked Securities or otherwise . . . related to or in connection with the consummation of" a business combination.[22] Second, "securities issued or issuable to any seller" in the business combination are excluded from the numerator, as are "any private placement units (or underlying securities) issued to ARC."[23] Third, 25% of these "issued or issuable" shares Class A Common Stock (less exclusions) are added to "number of shares of Class B Common Stock issued and outstanding" before the business combination.[24]

Specifically, Section 4.3(b)(ii) of the Charter states:

---

[20] Charter § 4.3(b)(ii).

[21] This number is not in dispute. *See* Pl.'s Corrected Opening Pre-trial Br. (Dkt. 72) ("Pl.'s Opening Br.") 33; Defs.' Pre-trial Answering Br. (Dkt. 143) ("Defs.' Answering Br.") Br. 26 n.29.

[22] Charter § 4.3(b)(ii).

[23] *Id.*

[24] *Id.*

6

(A) 25% of all shares of Class A Common Stock issued or issuable (upon the conversion or exercise of any Equity-linked Securities or otherwise) in each case by the Corporation related to or in connection with the consummation of the initial Business Combination (excluding any securities issued or issuable to any seller in the initial Business Combination and any private placement units (or underlying securities) issued to ARC Global Investments II LLC (the "Sponsor") or its affiliates upon conversion of loans made to the Corporation) plus (B) the number of shares of Class B Common Stock issued and outstanding prior to the closing of the initial Business Combination[.][25]

## D.     The Business Combination

On October 20, 2021, DWAC entered into a Merger Agreement with Trump Media & Technology Group Corp. ("TMTG").[26]  Under the Merger Agreement, TMTG stockholders would receive shares in DWAC equal to $875,000,000, subject to adjustments and the right to receive earnout shares after the closing.[27]  A May 2022 amendment to the Merger Agreement provided that holders of promissory notes issued by TMTG (the "TMTG Convertible Notes") would receive DWAC stock directly from DWAC.[28]

---

[25] *Id.*

[26] PTO ¶ 19; JX 9.  DWAC changed its name to Trump Media & Technology Group Corp. after the business combination closed.  To avoid confusion, this opinion refers to the pre-closing and post-closing publicly traded entity as "DWAC" and its pre-closing privately held counterparty, which is now a wholly owned subsidiary of DWAC, as "TMTG."

[27] JX 9 § 1.9(f); *see id.* § 7.3(d)(ix).

[28] JX 12 § 1.9(g).  The Merger Agreement defined the TMTG Convertible Notes as "(i) TMTG Executive Promissory Notes entered into in the ordinary course of TMTG's business as compensation for certain of its directors and officers and (ii) series of convertible promissory notes in the aggregate principal amount of up to $60,000,000 issued by TMTG pursuant to those certain note purchase agreements[.]"  Proxy Statement at 6.

7

The business combination encountered roadblocks to closing. Among them was an investigation by the United States Securities and Exchange Commission (SEC) into whether DWAC falsely represented that it lacked a potential merger target when it had already identified TMTG.[29] After the investigations began, TMTG asserted its right to withdraw from the Merger Agreement pending renegotiation.[30] On July 20, 2023, the SEC approved a settlement in principle.[31] In connection with the investigation, DWAC terminated Orlando as DWAC's Chairman and CEO in March 2023.[32]

TMTG and DWAC resumed negotiations. On August 9, DWAC and TMTG amended the Merger Agreement a second time.[33] Orlando signed the amendment on behalf of ARC.[34] The second amended Merger Agreement explained that the issued and outstanding TMTG Convertible Notes would "automatically convert

---

[29] JX 317. The SEC found that this conduct violated Sections 10(b) and 17(a)(2) of the Securities Act of 1933. *Id*. ¶¶ 46-47.

[30] Proxy Statement at 192; *see* JX 36.

[31] Proxy Statement at 63.

[32] *Id.* at 73. At the time of his termination, Orlando had not been charged with or found guilty of wrongdoing. On July 17, 2024, the SEC brought a separate complaint against Orlando. JX 348.

[33] JX 86.

[34] *Id.* at 8.

immediately prior to" the effective time of the merger "into a number of shares of [TMTG] Common Stock."[35]

### E.    The Post-IPO Issuances

DWAC issued additional securities after its IPO.  Several are relevant to this dispute.  Certain convertible notes were issued in exchange for services.  Warrants were also issued to resolve threatened litigation.

#### 1.    The Compensation Notes

In November 2023, the Compensation Committee of DWAC's Board of Directors proposed a plan to compensate the company's officers and directors with convertible notes (the "Compensation Notes").[36]  Those paid for their services by the Compensation Notes included defendants Eric Swider, Frank Andrews, Jeffrey Smith, and Edward Preble (together, the "Director Defendants").

Other than Swider, none of Director Defendants held interests in DWAC Class B Common Shares.[37]  Through the Compensation Notes, Swider received 192,000 shares.  Alexander Cano, DWAC's Secretary and President, received 165,500 shares.  Andrew, Smith, and Preble each received 97,500 shares.[38]  Renatus Advisors, LLC, of which Swider is the sole member, also received a promissory note

---

[35] *Id.* at 2.

[36] JX 46; JX 77 at 3.

[37] Proxy Statement at 308.

[38] JX 46 at 2.

of 225,000 shares.[39]  The Compensation Notes were payable by DWAC on the date it consummated the business combination.[40]

### 2. The Legal Services Note

DWAC also issued a note for $500,000 to pay an outside attorney who provided legal services to the company (the "Legal Services Note").[41]  The attorney's engagement letter said that he would provide "legal consultation to DWAC on various legal matters," including the pending federal investigations.[42] The Legal Services Note was the sole compensation for this legal advice.[43]

### 3. The Alternative Warrants

In December 2023 and January 2024, investors who had agreed to participate in DWAC's failed private investment in public equity (PIPE) offering sought other ways to provide financing to DWAC.  DWAC entered into a new $50,000,000 PIPE under the registration exemption in Section 4(a)(2) of the Securities Act of 1933.[44]

---

[39] Swider Dep. 22, 159-60.

[40] Proxy Statement at 22-23.

[41] JX 50.

[42] JX 45 § 1.

[43] *Id.* § 3 (describing the payment terms).

[44] Proxy Statement at 90 ("[O]n February 8, 2024, Digital World entered into a subscription agreement with certain institutional investors for the issuance of the Digital World Alternative Financing Notes, issuing $10,000,000 in Digital World Alternative Financing Notes to such institutional investors.  Digital World expects to issue the remaining up to $40,000,000 of such Digital World Alternative Financing Notes concurrently with the Closing.").

For some of the original investors who did not participate in the new PIPE, DWAC entered into warrant subscription agreements for the issuance of 3,050,000 warrants (the "Alternative Warrants").[45] The Alternative Warrants were issued in settlement of threatened litigation over the terminated PIPE.[46] The recipients of the Alternative Warrants did not make any monetary investment in or cash payment to DWAC in exchange.[47]

## F. The Conversion Ratio Calculation

As the business combination with TMTG neared, DWAC began preparing its proxy statement. One component of the filing was DWAC's forecast of the Conversion Ratio calculation. Orlando began to engage with ARC on the subject.

On February 4, 2024, Orlando told DWAC's counsel that the Charter required a Conversion Ratio of 1.58:1.[48] His calculation included shares associated with the Compensation Notes and the Alternative Warrants in the numerator but excluded shares associated with the TMTG Convertible Notes and certain units issued to ARC upon the conversion of loans from ARC to DWAC (the "ARC Notes").[49]

---

[45] *Id.* ("[O]n February 7, 2024, Digital World entered into warrant subscription agreements with certain institutional investors for the issuance of the Digital World Alternative Warrants in settlement of the terminated PIPE Investment . . . ."); JX 319.

[46] Proxy Statement at 90; *see also* Swider Dep. 232-36.

[47] *See, e.g.*, JX 72; JX 73; JX 74; JX 75 (Alternative Warrant Agreements).

[48] JX 321.

[49] *Id.*; *see* JX 31.

On February 11, DWAC's counsel sent Orlando a spreadsheet applying the company's calculation of the conversion ratio with corresponding explanations.[50] The spreadsheet excluded Class A shares issued or issuable in relation to the Compensation Notes, Legal Services Note, Alternative Warrants, TMTG Convertible Notes, and the ARC Notes from the numerator of the Conversion Ratio.[51] It reflected a ratio of 1.34:1. Orlando responded that ARC's "current calculation of the [C]onversion [R]atio is 1:1.69."[52]

## G. The Proxy Statement and Closing

On February 16, 2024, DWAC filed a proxy statement/prospectus with the SEC on Form 424(b)(4) (the "Proxy Statement").[53] The Proxy Statement alerted DWAC stockholders that a special meeting would be held on March 22, 2024 to approve the business combination with TMTG. The Proxy Statement also stated that DWAC had incurred "significant unanticipated expenses well in excess of the working capital loans provided by [ARC]," requiring the company to undertake post-IPO financings to raise money.[54]

---

[50] JX 57.

[51] JX 325.

[52] JX 323 at 1.

[53] Proxy Statement at 160.

[54] *Id.* at 96.

12

Proposal 9 of the Proxy describes Class A shares that would be issued or issuable upon stockholder approval of the proposal and the business combination:[55]

- (i) up to 7,969,145 shares of New Digital World common stock in connection with the conversion of any Digital World Convertible Notes and Digital World Alternative Financing Notes entered into prior to the consummation of the Business Combination;

- (ii) up to 6,552,509 shares of New Digital World common stock in connection with the exercise of Post-IPO Warrants; and

- (iii) up to 8,369,509 shares of New Digital World common stock issuable upon conversion of outstanding TMTG Convertible Notes immediately prior to the Effective Time in connection with the Closing.[56]

The Proxy Statement explained that these issuances would "trigger the anti-dilution provision contained in [the] Charter adjusting the [C]onversion [R]atio of [] Class B common stock to Class A common stock."[57]

The Proxy Statement also made disclosures about the Conversion Ratio. It explained that DWAC "expect[ed] the [C]onversion [R]atio rate to be 1.34, . . . exclud[ing] the expected issuance of the Digital World Alternative Warrants . . . and the [Compensation Notes]."[58] The Proxy Statement further stated that "when

---

[55] *Id.* at 224.

[56] *Id.*

[57] *Id.* at 96.

[58] *Id.*

13

calculating the definitive conversion ratio, the Board may also decide to exclude any Post-IPO Financings . . . As a result, the Board may find a different, lower conversion ratio to be acceptable at the time of the Closing."[59] It cautioned investors against "relying on" the disclosed ratio "[s]ince the Board is obligated to calculate the final conversion ratio upon the Closing" and there could be "no assurance that the current conversion ratio will not materially differ at the time of the Closing."[60] It described the dispute with ARC over the Conversion Ratio:

> [F]ollowing recent interactions with Mr. Orlando, it is understood that Mr. Orlando's position is that the conversion ratio should be 1.69. However, Digital World has not been able to confirm the basis for such a different conversion ratio. Should Mr. Orlando pursue these claims related to the adjustment and prevail, applying a 1.69 conversion ratio would result in the issuance of 4,939,038 shares of New Digital common stock compared to 2,433,729 shares of Class A common stock. If the conversion ratio were 1.34, Public Stockholders not redeeming their shares prior to the Closing are expected to bear the burden of this additional dilution.[61]

After this litigation was filed and ARC challenged the disclosures in the Proxy Statement, DWAC issued a March 1, 2024 Form 8-K disclosing a potential range for the Conversion Ratio.[62] It stated that the Board "may find a different, lower conversion ratio to be acceptable at the Closing."[63] DWAC reiterated that "certain

---

[59] *Id.* at 97.

[60] *Id.*

[61] *Id.*

[62] JX 99.

[63] *Id.* at 9.

holders of Class B common stock may disagree with the conversion ratio, particularly if the Board determined that other Post-IPO Financings should also be excluded resulting in a lower conversion ratio."[64]

On March 25, 2024, DWAC Merger Sub Inc. merged with and into TMTG, with TMTG surviving as a wholly owned subsidiary of DWAC.[65]  DWAC changed its name to "Trump Media & Technology Group Corp."[66]  TMTG's Registration Statement after the business combination stated that "[a]s a result of, and in connection with the Closing," the TMTG Convertible Notes converted into private shares of TMTG.[67]  Specifically, the Registration Statement explained:

> (i) immediately prior to the [Business Combination] the TMTG Convertible Notes were converted into TMTG Common Stock and all of the outstanding TMTG Common Stock that was issued upon such conversion was automatically cancelled and ceased to exist . . . [and] (iii) Public TMTG issued an aggregate of 95,354,534 shares of Public TMTG Common Stock to TMTG securityholders as of immediately prior to the Effective Time (which amount includes (x) 7,854,534 shares of Public TMTG Common Stock to the former holders of the TMTG Convertible Notes).[68]

Under the second amended Merger Agreement, the private stockholders of TMTG, including those who received their shares because of the conversion of the TMTG

---

[64] *Id.*

[65] JX 129 at 2.

[66] *Id.*

[67] JX 137 at F-28.

[68] *Id.*

15

Convertible Notes, received shares in the post-de-SPAC entity in exchange for their private TMTG shares.[69]

## H. This Litigation

On February 29, 2024, ARC filed this action against DWAC and the Director Defendants.[70] It advanced claims for breach of the Charter, declaratory judgment, and breach of fiduciary duty. ARC initially alleged that the proper Conversion Ratio was 1.78:1.[71]

On March 5, I expedited the litigation so that ARC's claims could be resolved before the expiration of a contractual lock-up period on transferring the relevant shares.[72] I ordered DWAC to place into escrow "the number of shares of Class A common stock shares reflecting the difference between the conversion ratio of DWAC Class B common stock shares employed by DWAC at closing and a conversion of DWAC Class B common stock shares at a ratio of 2:1."[73] The escrow agent is to release the disputed shares sufficient to satisfy ARC's conversion rights

---

[69] JX 86; JX 137 at 2.

[70] Dkt. 1.

[71] *Id.* ¶ 35.

[72] Dkt. 23.

[73] Dkt. 28 ¶ 1. This order had the effect of allowing ARC to maintain standing in this action after closing.

under the Charter within two business days of a direction from this court or a joint, written direction from ARC and DWAC.[74]

On May 23, after fact discovery was complete, ARC sought leave to amend its complaint.[75]  The defendants opposed this request.  I denied ARC's motion in part but allowed ARC to make amendments reflecting theories on the conversion ratio and personal animus against Orlando that were developed during discovery.[76] I also permitted the defendants to take limited discovery into the newly pleaded theories.

ARC filed its amended complaint on June 7.[77]  On June 12, the defendants answered the amended complaint and raised seven affirmative defenses.[78]

The litigation proceeded to a one-day trial on a paper record on July 29.  In addition to the parties' claims and defenses, several other motions were submitted for resolution by the court.  ARC moved to exclude an estoppel theory advanced by the defendants, to strike the defendants' new affirmative defenses, and to exclude from evidence testimony regarding reliance on counsel and a late-produced

---

[74] JX 124 at 16-17.

[75] Dkt. 67.

[76] Dkt. 126 at 44.

[77] Dkt. 91.

[78] Dkt. 108.

document.[79]  The defendants moved to exclude certain extrinsic evidence and for partial judgment on the pleadings related to ARC's breach of fiduciary duty claim.[80]

These matters were taken under advisement upon the conclusion of trial.  I committed to resolve then within 150 days of the closing of the business combination, at which point the contractual lock-up period expires.[81]  That date is September 19, 2024.

## II.    LEGAL ANALYSIS

ARC's primary claim is that DWAC breached the Charter by miscalculating the numerator to the Conversion Ratio.   It also asserts that the Director Defendants breached their fiduciary duties by making false and misleading disclosures in the Proxy about the Conversion Ratio.

ARC has the burden to prove these claims by a preponderance of the evidence.[82]  "Proof by a preponderance of the evidence means proof that something is more likely than not."[83]  ARC has met this burden for certain of its contentions

---

[79] Dkts. 77, 136-37, 184.

[80] Dkts. 151, 152.

[81] Dkt 28.

[82] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010).

[83] *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2016 WL 5660282, at *13 (Del. Ch. Sept. 30, 2016), *aff'd in part, rev'd in part on other grounds sub nom. Heartland Payment Sys., LLC v. inTEAM Assocs., LLC*, 171 A.3d 544 (Del. 2017).

that the defendants breached the Charter in setting the Conversion Ratio. It has otherwise fallen short.

## A. Breach of Contract

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[84] The Charter imposed a contractual duty on DWAC regarding the Conversion Ratio.[85] Resolving ARC's claim turns on whether DWAC improperly excluded certain securities from the Conversion Ratio calculation in contravention of the Charter, causing damage to ARC.

The principles of contract interpretation that govern my review of the Charter are well established. "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[86] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement."[87]

---

[84] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[85] Charter § 4.3.

[86] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[87] *Id.* at 368 (quoting *GMG Cap. Invs., LLC*, 36 A.3d 776, 779 (Del. 2012)); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.").

A contract must "be construed in its entirety, and an attempt should be made to reconcile all of [its] provisions in order to determine the meaning intended to be given to any portion of it."[88] Additionally, the court "will give each provision and term effect, so as not to render any part of the contract mere surplusage."[89]

ARC reads Section 4.3(b)(ii) of the Charter as requiring a simple exercise in division. The denominator is 7,158,025, which is the undisputed total amount of outstanding Class B shares.[90] The numerator is the Class B shares plus "25% of all shares of Class A common Stock issued or issuable (upon the conversion or exercise of any Equity-linked Securities or otherwise)" with two exceptions: (1) "any securities issued or issuable to any seller in the initial Business Combination" and (2) shares derived from "any private placement units (or underlying securities)" issued to ARC "upon conversion of loans made to the [DWAC]."[91]

ARC contends that the defendants made several exclusions from the numerator that are inconsistent with this formula. These exclusions concern three categories of post-IPO securities: (1) the Compensation Notes, Alternative Warrants, and Legal Services Note; (2) the TMTG Convertible Notes; and (3) the ARC Notes.

---

[88] *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 967 (Del. Ch. 1989), *aff'd*, 567 A.2d 419 (Del. 1989) (internal citation omitted).

[89] *Osborn*, 991 at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010)).

[90] Charter § 4.3(b)(ii); JX 130 at 20; *see supra* note 21.

[91] Charter § 4.3(b)(ii).

In addition, ARC argues that certain shares listed in the post-closing registration statement were wrongfully omitted from the numerator.

### 1. Equity-linked Securities

Section 4.3(b)(ii) of the Charter states that the numerator of the Conversion Ratio must include shares of "Class A Common Stock issued or issuable (upon the conversion or exercise of any Equity-linked Securities *or otherwise*) . . . ."[92] DWAC excluded the shares issued in connection with the Compensation Notes, Legal Services Note, and Alternative Warrants on the ground that they were not "Equity-linked Securities." The Charter defines "Equity-linked Securities" as "debt or equity securities that are convertible, exercisable or exchangeable for shares of Class A common stock issued in a financing transaction in connection with the initial Business Combination."[93]

Under ARC's reading of the Charter, however, it does not matter whether these are Equity-linked Securities because the only relevant question is whether Class A shares are issued or issuable.[94] To determine whether the Conversion Ratio is triggered, the Charter requires a determination that "additional shares of Class A Common Stock, or Equity-linked Securities . . . are issued or deemed issued in

---

[92] Charter § 4.3(b)(ii) (emphasis added).

[93] *Id.*

[94] *See* Pl.'s Opening Br. 35-36.

21

excess of the amounts sold in [DWAC's] initial public offering of securities."[95] Either (1) an issuance or deemed issuance of Class A Common Stock or (2) an issuance or deemed issuance of an Equity-linked Security is sufficient. Once the Conversion Ratio is triggered, the Charter requires that "25% of all shares of Class A Common Stock issued or issuable" be included in the numerator.[96]

The Charter explains that this figure generally includes "all shares of Class A Common stock" that are issued or issuable "upon the conversion or exercise of any Equity-linked Securities or otherwise," with two specific exclusions.[97] ARC reads the word "otherwise" in this provision broadly and consistent with its ordinary meaning of "in a different way."[98] ARC argues that the text clarifies that other than the two identified exclusions, all other issued or issuable Class A shares are included in the figure regardless of whether they result from the conversion or exercise of Equity-linked Securities.

DWAC reads the provision differently. It maintains that only shares issued or issuable due to an Equity-linked Security should be included in the numerator,

---

[95] Charter § 4.3(b)(ii). There is no dispute that the Conversion Ratio was triggered.

[96] *Id.*

[97] *Id.*; *see infra* Sections II.A.2-3 (discussing the exceptions).

[98] Pl.'s Pre-trial Reply Br. (Dkt. 162) 11 (quoting *Otherwise*, Black's Law Dictionary (12th ed. 2024)).

based on a narrow reading of "otherwise."[99]  In contrast to ARC's reading, DWAC avers that the phrase "accounts for the various manners in which Equity-linked Securities could become Class A stock."[100]

DWAC's interpretation invokes the *ejusdem generis* canon of construction, which instructs that a general word after a list of particulars is "controlled and defined by reference" to the terms preceding it.[101]  It relies on *Sullivan Money Management, Inc. v. FLS Holdings Inc.*, where the Court of Chancery applied the *ejusdem generis* canon in interpreting a charter provision requiring a class vote to change the terms and provisions of preferred stock "by amendment to the Certificate of Incorporation or otherwise."[102]  The court construed the "otherwise" clause narrowly because a broad reading would change the terms of the preferred stock by giving preferred stockholders a class vote on a merger.[103]

---

[99] Defs.' Answering Br. 41.

[100] *Id.* at 40-41.

[101] *Sw. Airlines Co. v. Saxon*, 596 U.S. 450 (2022) (citation omitted).

[102] 1992 WL 345453, at *2 (Del. Ch. Nov. 20, 1992).  DWAC cites to the United States Supreme Court's recent *Fischer* decision, which applied *ejusdem generis* in holding that a residual "otherwise" clause in a criminal statute should be narrowly construed since it followed a list of specific criminal violations.  Defs.' Answering Br. 43 (citing *Fischer v. United States*, 603 U.S. --, 144 S. Ct. 2176 (2024)).  This reading was supported by the fact that the statute outlined "specific criminal acts and settings," such that a broad reading of "otherwise" would obviate the overall context of the statute in the criminal code.  *Fischer*, 144 S. Ct. at 2178.  No such considerations apply to the Charter.

[103] *Sullivan*, 1992 WL 345453, at *2.

But Delaware courts neither reflexively apply canons of construction nor "mechanically assign[] specific words their ordinary meaning."[104]  The court must instead construe the contract as a whole to interpret a term in context.  "The object of construction is to ascertain the true intent from the words used, not how meaningless the words can be made by the application of any given rule."[105]

Here, the point of Section 4.3 is to prevent dilution.  For the Class B stockholders to maintain 20% of the company's common stock on an as-converted basis, the Class B stockholders would be issued one share for every four shares issuable—i.e., 25% of all issuable shares.  Consistent with this purpose, Section 4.3(b)(ii) contemplates the inclusion of "25% of *all* shares of Class A Common Stock [that are] issued or issuable."[106]  ARC's interpretation of "or otherwise" as meaning that shares are included regardless of the form in which the right to that share is created gives effect to this language and intent.[107]

DWAC's interpretation, by contrast, would significantly curtail the anti-dilution provision by limiting the numerator to 25% of shares issued or issuable

---

[104] *Id.* at *4.

[105] *State ex rel. Waldman v. Miller-Wohl Co.*, 28 A.2d 148, 152 (Del. Super. 1942).

[106] Charter § 4.3(b)(ii) (emphasis added).

[107] *See In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 961 n.52 (Del. Ch. 2001) (stating that the "words 'or otherwise' in the certificate may be expansive enough to cover a reverse split" effected by hundreds of individual contracts since the certificate included the parenthetical "by reverse stock split, reclassification, or otherwise").

through Equity-linked Securities. DWAC believes that the word "otherwise" should be limited to the narrow definition of Equity-linked Securities.[108] Yet the only examples DWAC can conjure of what "otherwise" would mean are "a precursor to an equity-linked security" and "something that [was] questionable [as to] whether it constituted . . . a security."[109] That is, DWAC cannot give a concrete example of what "otherwise" would capture if it only accounted for the ways in which Equity-linked Securities became Class A stock. Its reading would make the phrase "or otherwise" superfluous.[110]

Accordingly, the Conversion Ratio considers all issued or issuable shares of Class A Common Stock, with two defined exceptions. I need not determine if the Legal Services Notes, Alternative Warrants, and Compensation Notes fall within the definition of Equity-linked Securities. The Class A shares issued or issuable from the conversion or exercise of these securities must be included in the numerator of the Conversion Ratio regardless.

### 2. TMTG Convertible Noteholders

One of the two categories of shares that Section 4.3(b)(ii) of the Charter excludes from the Conversion Ratio is "securities issued or issuable to any seller in

---

[108] Defs.' Answering Br. 41.

[109] Tr. of July 29, 2024 Trial (Dkt. 204) ("Trial Tr.") 196-97.

[110] *See Osborn*, 991 A.2d at 1159.

the Business Combination."[111]    ARC does not challenge DWAC's exclusion of shares of Class A Common Stock paid to the pre-closing equity holders of TMTG.[112] They dispute whether DWAC should have excluded approximately 8,369,509 shares issued to former TMGC Convertible Noteholders at closing.[113]

The Charter does not define "seller."  The word is commonly understood to mean "[o]ne who sells anything; the party who transfers property in the contract of sale."[114]    It is the "correlative [of] 'buyer' or 'purchaser.'"[115]    Applying this definition, TMTG equity holders who received consideration for their shares in the business combination are "sellers."[116]

---

[111] Charter § 4.3(b)(ii).

[112] *See* Pl.'s Opening Br. 43.

[113] The total number of shares corresponding to this input is also in dispute. The Proxy Statement stated that "up to 8,369,509 shares" were issuable upon conversion of the TMTG Convertible Notes, and ARC uses this number.  Proxy Statement at 236; Pl.'s Opening Br. 29.  DWAC avers that the correct number is the "final tally" of shares issued (7,854,534) rather than the maximum issuable according to the Proxy Statement.  Defs.' Answering Br. 65.  Since I decline to include these shares in the numerator, I need not resolve which value is correct.

[114] *Seller*, Black's Law Dictionary (10th ed. 2014).

[115] *Id.*

[116] ARC concedes that "sellers" is unambiguous; I agree.  Nevertheless, ARC relies on extrinsic evidence to argue that the defendants never considered TMTG creditors to be sellers. *See*  Pl.'s Opening Br. 46-47.  This evidence has no bearing on the plain text of the Charter.  For example, the fact that the "Seller Representative" discussed in the Merger Agreement does not represent former holders of TMTG Convertible Notes does not mean that those former noteholders were not sellers at closing under the Charter.  *See* Pl.'s Opening Br. 45-46 (citing JX 86 at 5).

ARC asserts that that the holders of TMTG Convertible Notes were creditors of TMTG—not sellers.[117]  By their terms, however, the TMTG Convertible Notes "automatically converted" into TMTG shares "immediately prior to the closing" of the business combination.[118]  The Merger Agreement confirms that the TMTG Convertible Notes would "automatically convert immediately prior to the Effective Time into a number of shares of [TMTG] Common Stock."[119]

ARC insists that this conversion was an "accounting mechanic."[120]  Perhaps. But the TMTG Convertible Noteholders were nevertheless TMTG equity holders immediately before closing.[121]  The contemporaneous transaction documents confirm this transactional reality.  The transfer agent was directed to "[i]ssue an aggregate of 94,739,894 shares of New Digital World common stock" for all private

---

[117] Pl.'s Opening Br. 43.

[118] JX 318.

[119] JX 86 at '796; *see also* JX 137 ("[P]rior to the Effective Time, the issued and outstanding TMTG Convertible Notes will be converted into shares of TMTG common stock.").  The Merger Agreement defines "Effective Time" as the time at which "[t]he [p]arties . . . shall cause the Merger to be consummated by filing the Certificate of Merger for the merger of [the DWAC merger subsidiary] with and into [TMTG] . . . with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DGCL."  JX 9 § 1.2.

[120] Pl.'s Opening Br. 45.

[121] *Cf. Salladay v. Lev*, 2020 WL 954032, at *15 & n.172 (Del. Ch. Feb. 27, 2020) (discussing that the "ownership stake at the effective time" of the merger included "[n]otes [that] would automatically convert into shares of [the company's] common stock immediately prior to the consummation of the [t]ransaction").

TMTG stockholders—including the former TMTG Convertible Noteholders.[122]

Because the TMTG Convertible Notes were converted into TMTG stock before the business combination closed, the creditors became equity holders after the initiation of the closing process but before the business combination occurred. They were therefore "sellers" in the business combination under Section 4.3(b)(ii) of the Charter and properly excluded from the numerator of the Conversion Ratio.

### 3. ARC Notes

The second category of securities that could be excluded from the Conversion Ratio under Section 4.3(b)(ii) of the Charter is "any private placement units (or underlying securities) issued to [ARC] or its affiliates upon conversion of loans

---

[122] JX 329 at 2. The instructions to the transfer agent noted that a list of persons to whom the shares would be issued and the amounts issued per person were included in "Annex D." *Id.* But Annex D was not included with the version of the letter produced by the transfer agent. *Id.* at 13 ("See attached Excel."). The defendants produced a spreadsheet of Annex D after ARC had filed its pretrial reply brief. ARC moved to exclude that document because the spreadsheet was produced after the close of fact discovery and sought an adverse inference. Dkt. 184; *see also* Dkt. 190. I decline to exclude the document. ARC first raised its theory that the TMTG Convertible Noteholders were not "sellers" after discovery closed. It was on notice of the existence of Annex D for months, after receiving the letter referencing it in a production from the transfer agent. And it carries the burden of proof. *See e.g.*, *Oberly v. Howard Hughes Medical Inst.*, 472 A.2d 366, 387 (Del. Ch. 1984) (stating that where the "nonexistence of a fact" was required to prevail, the "burden of proof as to a negative proposition also rests upon the party asserting it"); 29 Am. Jur. 2d *Evidence* § 173, Westlaw (database updated Aug. 2024) ("[W]hoever asserts a claim . . . that . . . depends upon a negative proposition has the burden of establishing the truth of the assertion[.]"). Even without Annex D, I would conclude that the TMTG Convertible Noteholders were "sellers" under Section 4.3(b)(ii).

made to [DWAC]."[123]  Although the Charter does not define "private placement,"

the generally accepted meaning of this term is a sale of securities to select investors

through an unregistered private offering.[124]

DWAC invoked this exception in connection with the ARC Notes, which

were promissory notes memorializing loans from ARC to DWAC.  DWAC excluded

from the Conversion Ratio 446,355 shares of Class A Common Stock that were

issued to ARC upon the conversion of the ARC Notes.[125]  ARC obtained the ARC

Notes through a private offering.[126]  The unpaid principal amount of the ARC Notes

was convertible into "Conversion Units" equal to one share of Class A Common

Stock and one-half of one warrant to purchase one share of Class A Common

Stock.[127]

---

[123] Charter § 4.3(b)(ii).

[124] *See, e.g.*, Office of the Comptroller of the Currency, *Comptroller's Handbook (Section 411) Narrative and Procedures: Private Placements* 1 (1990); *see generally In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 794 (Del. Ch. 2022) (discussing a private placement to a SPAC sponsor).

[125] ARC disputes whether DWAC shorted it 45,000 shares when converting the ARC Notes.  *See* Pl.'s Opening Br. 42 & n.15.  ARC has agreed, however, to seek a finding that 446,355 shares of Class A Common Stock should have been included in the numerator.  It reserves the right to resolve the potential discrepancy at a later time.

[126] *See* Trial Tr. at 102-03 ("It is a type of private placement and a unit is derived from it.").

[127] JX 22 at 12; JX 21 § 15(a); JX 30 § 16(a); JX 31 § 16(a).

A plain reading of the Charter supports DWAC's exclusion of the shares derived from the ARC Notes. So does the purpose of the Conversion Ratio. ARC's interest was not diluted by shares issued to ARC.

Yet ARC insists that the ARC Notes cannot be classified as a "private placement." It draws a distinction between private placement units ARC purchased in conjunction with the IPO (which it believes should be excluded from the Conversion Ratio) and subsequent private placement convertible note issuances (such as the ARC Notes).[128] ARC relies on the fact that the securities associated with the ARC Notes were defined as "Conversion Units" and not "private placement units."[129] But the nomenclature assigned to the units does not change the fact that they were obtained by ARC through a private placement. The loan documents confirm that the "Conversion Units" were "identical to units issued . . . in the private placement that closed contemporaneously with" DWAC's IPO.[130]

The text of Section 4.3(b)(ii) of the Charter further belies ARC's distinction. The initial private placement at the IPO involved a purchase of units by ARC. The Charter, however, addresses "private placement units issued to [ARC] ***upon***

---

[128] Pl.'s Opening Br. 40-41; *see also* Trial Tr. 101-02.

[129] JX 21 § 15(a); JX 30 § 16(a); JX 31 § 16(a).

[130] JX 30 § 16(a); JX 31 § 16(a); *see also* JX 21 § 15(a) ("The Conversion Units shall be identical to the units issued . . . in a private placement upon consummation of the IPO.").

*conversion of loans* to [DWAC]."[131] ARC's attempt to restrict the Conversion Ratio exception to initial private placement units purchased by ARC would leave the phrase "upon conversion of loans" meaningless.

### 4.    Inclusion of "Missing" Shares

Finally, ARC asserts that DWAC improperly excluded 524,594 shares of Class A Common Stock from the Conversion Ratio. ARC is suspicious of 35 "Selling Securityholders" listed on DWAC's April 15, 2024 Registration Statement who collectively obtained these shares.[132] Though ARC questions how these individuals received unregistered Class A shares, it avers that if the shares were issued, they must be reflected in the numerator.[133]

The Conversion Ratio calculated by DWAC already accounts for these shares. The Registration Statement lists all individuals who received TMTG shares through resale transactions.[134] These "Other Securityholders" together held 1,627,700 shares as of the filing of the Registration Statement.[135] A total of 4,600 shares belonging to two stockholders were mistakenly excluded from this list in the Registration

---

[131] Charter § 4.3(b)(ii) (emphasis added).

[132] Pl.'s Opening Br. 29-31; *see* JX 137 at 129, 130-32.

[133] Pl.'s Opening Br. 31.

[134] JX 137 at 130-34. DWAC explained that noteholders who received shares upon the business combination passed them on to other parties. *See* Trial Tr. 258-59.

[135] *See* JX 137 at 130-32 (under "Other Securityholders" heading).

Statement.[136]   With these shares, the "Other Securityholders" received 1,632,300 shares.[137]

Although these 4,600 shares were not reflected in the original Registration Statement, the shares were included in the numerator of the Conversion Ratio.  The records of DWAC's transfer agent address 1,632,300 shares.[138]   DWAC's calculation of the Conversion Ratio accounts for 1,632,299 shares.[139]

There is a discrepancy of a single share, which DWAC attributes to a rounding error.[140]  Apart from that share, ARC failed to prove that DWAC omitted these shares when calculating the Conversion Ratio.  To require DWAC to include them again, as ARC requests, would lead to double counting.

\* \* \*

ARC prevails, in part, on its breach of contract claim.  The correct Conversion Ratio is 1.4911:1.  This Conversion Ratio reflects the inclusion of shares issued or issuable in respect of the Alternative Warrants, Legal Services Note, and

---

[136] *Compare* JX 137 at 130 (listing 10,866 shares for David Jimmerson and 3,334 shares for Luis Enrique Cruz), *with* Trump Media & Technology Group Corp., Am. No. 3 to Form S-1 (filed with the SEC June 17, 2024) at 125 (listing 14,633 shares for David Jimmerson and 4,167 shares for Luis Enrique Cruz).

[137] 1,627,700 + 3,767 + 833 = 1,632,300 shares.

[138] JX 330.

[139] *See* JX 130 at 18-20.

[140] *See* Defs.' Answering Br. 66.

32

Compensation Notes. It excludes shares issued or issuable in respect of the ARC Notes and TMTG Convertible Notes.

The following table summarizes the shares includable in the numerator of the Conversion Ratio, the implied conversion ratio based on the total number of shares, and the shares to which ARC is entitled applying the final Conversion Ratio. For the sake of comparison, the position of each party is also listed.

| | | ARC's Position | DWAC's Position | The Court's Conclusion |
|---|---|---|---|---|
| **INCLUDABLE SHARES** | Equity-linked Securities[141] | 9,967,174 | 9,967,174 | 9,967,174 |
| | Alternative Warrants | 3,055,000 | - | 3,055,000 |
| | Legal Services Note | 75,000 | - | 75,000 |
| | Compensation Notes | 965,125 | - | 965,125 |
| | Convertible Notes | 8,369,509 | - | - |
| | ARC Notes | 446,355 | - | - |
| | "Missing" Shares | 524,594 | - | - |
| | **Total** | 23,402,757 | 9,967,167 | **14,062,299** |
| | **Implied Conversion Ratio** | 1.8174:1[142] | 1.3481:1 | **1.4911:1**[143] |
| | **Resulting Class A Shares** | 9,977,311 | 7,041,134 | **8,186,345**[144] |

---

[141] This row includes certain Equity-linked Securities issued by DWAC after the IPO in connection with the consummation of the business transaction. *See* JX 130 at 19-20; Defs.' Answering Br. 30. These securities and the associated shares are not in dispute.

[142] My calculation using ARC's numbers yields this figure instead of the 1.8178:1 ratio in ARC's briefing.

[143] Conversion Ratio = (25% of New A Shares + B Shares) / B Shares = ((0.25 x 14,062,299) + 7,158,025) / 7,158,025 = 1.4911.

[144] ARC is entitled to 8,186,345 Class A shares in conversion for its 5,490,000 Class B shares. 5,490,000 x 1.4911 = 8,186,345.

## B. Breach of Fiduciary Duty

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[145] The Director Defendants owed fiduciary duties to all DWAC stockholders, including ARC. ARC claims that the Director Defendants breached those fiduciary duties in two ways: by calculating the Conversion Ratio in bad faith and by issuing false and misleading disclosures about the Conversion Ratio.[146] Neither theory succeeds.

### 1. Calculation of the Conversion Ratio

ARC claims that the Director Defendants breached their fiduciary duties by deliberately advancing an erroneous Conversion Ratio.[147] According to ARC, the Director Defendants were motivated to miscalculate the Conversion Ratio out of "personal animus" toward Orlando.[148] ARC cites to evidence of Orlando being excluded from DWAC Board meetings about the Conversion Ratio and claims of privilege by the defendants in this litigation as reflecting bad faith.[149]

---

[145] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010) (citation omitted), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

[146] *See* PTO ¶¶ 37, 40; *see also* Compl. ¶¶ 63-64.

[147] *See* PTO ¶ 40.

[148] Compl. ¶ 51.

[149] *See* Pl.'s Opening Br. 18 n.5.

ARC's fiduciary duty claim concerns a contractual right affecting DWAC's Class B stockholders—not a fiduciary duty owed to all DWAC stockholders. ARC complains that the Director Defendants harmed Class B stockholders by miscalculating the Conversion Ratio. This is the same harm complained of in ARC's breach of contract claim, in which ARC alleges that the defendants contravened the Charter.[150] ARC "may not 'bootstrap' a breach of fiduciary duty claim into a breach of contract claim merely by restating the breach of contract claim as a breach of fiduciary duty."[151]

Above, I concluded that ARC prevailed in part on its breach of contract claim. DWAC misapplied certain figures in calculating the numerator of the Conversion Ratio. ARC is entitled to a remedy to compensate it for that breach. But it cannot also recover for its superfluous breach of fiduciary duty claim.[152]

---

[150] *Cf. MultiPlan*, 268 A.3d at 806 (concluding that a fiduciary duty claim was separate from a contract claim, where the right at issue was provided in accordance with the certificate of incorporation but the defendants disloyally frustrated it).

[151] *Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009); *see also Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010) ("It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract . . . any fiduciary claims arising out of the same facts that underlie the contract obligations [will] be foreclosed as superfluous.").

[152] *See Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *8 (Del. Ch. Aug. 16, 2010) (explaining that in assessing whether there is an independent basis for a fiduciary duty claim involving contractual rights, the court will consider whether the fiduciary duty claims "depend[] on additional facts, [are] broader in scope, and involve[] different potential remedies").

## 2. Disclosures About the Conversion Ratio

ARC also claims that the Director Defendants breached their fiduciary duties by seeking stockholder approval of the business combination and a Charter amendment on the basis of a materially false and misleading Proxy Statement.[153] It raises three alleged issues with the Proxy Statement disclosures:[154] (1) misstating that DWAC's Board had discretion in setting the Conversion Ratio and that a lower Conversion Ratio could be applicable;[155] (2) misstating that working capital loans provided by ARC did not trigger the anti-dilution provision in the Charter;[156] and (3) omitting that the second amendment to the Merger Agreement was meant to ensure that TMTG Convertible Notes were dilutive to Class B stockholders.[157]

---

[153] PTO ¶ 37.

[154] *See* Pl.s' Opening Br. 49-50.

[155] Proxy Statement at 109 (disclosing that "when calculating the definitive conversion ratio, the Board may also decide to exclude any Post-IPO Financings" and "[a]s a result, the Board may find a different, lower conversion ratio to be acceptable at the time of the Closing"); *see also id.* ("Class B common stock may disagree with the conversion ratio, particularly if the Board decides that other Post-IPO Financings should also be excluded resulting in a lower conversion ratio and therefore a lower number of shares of New Digital World common stock upon conversion of the Class B common stock.").

[156] *Id.* at 108 ("Our Charter provides for an adjustment mechanism to the conversion ratio applicable to Class B common stock to the extent that additional shares of Class A common stock or equity-linked securities are issued in connection with the closing of an initial business combination. As such, unlike working capital loans provided by our Sponsor, Post-IPO Financings with third parties other than the Sponsor, trigger the anti-dilution provision contained in our Charter, adjusting the conversion ratio of our Class B common stock to Class A common stock for the benefit of holders of our Class B common stock.").

[157] *Id.* at 204-05.

"Delaware law imposes upon a board of directors the fiduciary duty to disclose fully and fairly all material facts within its control that would have a significant effect upon a stockholder vote."[158]  Information is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[159]  None of the challenged disclosures meet this test.

First, I cannot conclude that the descriptions of the Conversion Ratio in the Proxy Statement were materially false or misleading.  This litigation demonstrates that the Conversion Ratio is complicated in application.  ARC itself has changed its preferred calculation approach multiple times.  The Director Defendants accurately communicated in the Proxy Statement that they were tasked with calculating the Conversion Ratio and that a decision on the calculation would be forthcoming.[160] The Proxy Statement cautioned stockholders that DWAC "c[ould ]not provide assurances regarding its ability to defend its position on the anti-dilution provision."[161]

---

[158] *Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992).

[159] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018) (quoting *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del. 1985)).

[160] Proxy Statement at 96-97 (stating that DWAC "expect[ed] the conversion ratio rate to be 1.34," that the "Board may [] decide to exclude" certain financings from the Conversion Ratio and "may find a different, lower conversion ratio to be acceptable at the time of the Closing," and that "there is no assurance that the current conversion ratio will not materially differ at the time of the Closing").

[161] *Id.*

The disclosures about the ARC Notes were also accurate. DWAC properly disclosed that "unlike working capital loans provide by our Sponsor, Post-IPO Financings with third parties other than the Sponsor[] trigger the anti-dilution provision contained in our Charter."[162]

Nor can I conclude that the disclosures about the second amendment to the Merger Agreement were materially false or misleading. The Proxy Statement discloses that, under the amendment, TMTG Convertible Noteholders would become TMTG stockholders immediately before the business combination.[163] This is not misleading. The Proxy Statement described the conversion consistent with the terms of the notes.[164] There is no evidence that the Director Defendants entered into the second amendment to the Merger Agreement (which Orlando signed) with the intent to dilute Class B stockholders.

Further, there is no basis to conclude that these alleged misstatements would have been important to DWAC stockholders in deciding how to vote. Voting stockholders would have wanted to understand the Conversion Ratio calculation insofar as it affected their transaction consideration.[165] But it is hard to imagine that

---

[162] *Id.* at 96; *see also* Section II.A.3.

[163] Proxy Statement at 224.

[164] *See supra* Section II.A.2.

[165] *Cf. Gilmartin v. Adobe Res. Corp.*, 1992 WL 71510, at *10 (Del. Ch. Apr. 6, 1992) ("[I]t is axiomatic that [information concerning] the fairness of the consideration offered . . . is material.").

they would have been focused on the extent of the Board's discretion performing the calculation. Stockholders were also entitled to—and could—understand the terms of the second amendment to the Merger Agreement, rather than ARC's disproven suspicions about the impetus of the amendment. Nothing in the record indicates that the Director Defendants intentionally misrepresented the Conversion Ratio or the second amendment to the Merger Agreement.[166]

## C. Affirmative Defenses

The defendants put forth seven affirmative defenses. Two defenses—for failure to state a claim and the application of an exculpatory Charter provision—were presented in the answer to ARC's original pleading.[167] Neither defense affects the determinations made above.

After ARC was permitted to amend its complaint to add revised allegations slightly changing its calculation of the Conversion Ratio and about its personal animus theory, the defendants raised five new affirmative defenses.[168] These defenses are: (1) estoppel; (2) unclean hands; (3) laches; (4) *in pari delicto*; and (5)

---

[166] *E.g.*, Swider Dep. 46-48.

[167] Dkt. 32 at 20-21.

[168] *See* Dkts. 91, 108.

the parol evidence rule.[169] ARC filed motions to exclude these affirmative defenses as untimely and baseless.[170]

Court of Chancery Rule 8(c) provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . estoppel."[171] Affirmative defenses not timely pleaded are waived.[172] But the new defenses are not unique to ARC's amended allegations and theories. They could have been raised in response to ARC's initial complaint.

The amended complaint afforded the defendants an opportunity to assert new affirmative defenses as to the newly pleaded matters.[173] It did not create an opportunity for a do-over to raise defenses that could have been brought months earlier. Since the affirmative defenses were not linked to the two matters first raised in the amended complaint, they were waived.[174]

---

[169] Dkt. 108 at 27-28.

[170] Dkts. 147, 155, 168; *see also* Dkts. 77, 156, 169.

[171] Ct. Ch. R. 8(c)(1).

[172] *E.g.*, *In re Tr. FBO duPont Under Tr. Agreement Dated August 4, 1936*, 2018 WL 4610766, at *11 (Del. Ch. Sept. 25, 2018) ("[A]ffirmative defenses that are not plead are waived.").

[173] Ct. Ch. R. 12(h)(6) ("If a pleading raises new matter that is subject to a defense listed in Rule 12(b)(2)-(6), then an opposing party may assert that defense—even if not asserted or preserved initially—as to the new matter.").

[174] *See Deene v. Peterman*, 2007 WL 2162570, at *7 (Del. Ch. July 12, 2007) (explaining that any defense not raised initially is deemed waived).

The estoppel affirmative defense is perhaps the most obvious case of waiver.[175] The defendants allege that ARC communicated positions to them about the Conversion Ratio on which they purportedly relied to their detriment in making public disclosures.[176] Although ARC's original complaint alleged that the Conversion Ratio was higher than disclosed in the Proxy Statement, the defendants' answer to that pleading lacked an estoppel affirmative defense.[177] Instead, the defendants attempted to present an estoppel defense in a draft pre-trial order on March 27—before ARC moved to amend its complaint.[178]

The defendants' affirmative defenses are not only late but also weak. To prevail on an estoppel theory, a party must show that it: "(i) lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) suffered a prejudicial change of position as a result of [its] reliance."[179] How DWAC and the Director Defendants lacked knowledge of the facts needed to calculate the

---

[175] *Cf. Abdi v. NVR, Inc.*, 945 A.2d 1167 (Del. 2008) (TABLE) (holding that the failure to plead an affirmative defense in the answer to a complaint constitutes a waiver of the right to assert that defense).

[176] Dkt. 108 at 27.

[177] Dkt. 1 ¶ 41; Dkt. 32 at 20-21.

[178] Dkt. 147 Ex. E ¶ 45.

[179] *HC Cos. v. Myers Indus., Inc.*, 2017 WL 6016573, at *7 (Del. Ch. Dec. 5, 2017) (citation omitted).

Conversion Ratio or reasonably relied on the views of Orlando and ARC alone is unapparent.

The other affirmative defenses fare no better. The defendants' unclean hands theory fails because it concerns purported breaches of fiduciary duty by Orlando as ARC's managing member, which are unrelated to ARC's claims here about the Conversion Ratio.[180] The *in pari delicto* theory fails for similar reasons since allegations of breaches of fiduciary duty and illegal conduct by Orlando have no bearing on the calculation of the Conversion Ratio.[181] The defendants' laches defense concerns the timing of ARC's amended complaint, which I previously resolved in ruling on ARC's motion to amend.[182] And the "parol evidence" affirmative defense is instead an evidentiary argument.[183]

---

[180] Dkt. 108 at 27; *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80-81 (Del. Ch. 2008) (explaining that the equitable doctrine of unclean hands "provides that 'a litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits his right to have the court hear his claim'" (quoting *Nakahara v. NS 1991 Am. Tr.*, 739 A.2d 770, 791-92 (Del. Ch. 1998))).

[181] *See In re LJM2 Co-Inv., L.P.*, 866 A.2d 762, 775-76 (Del. Ch. 2004). The doctrine of *in pari delicto* bars a party's recovery where it is equally at fault. It is based on the "principle of public policy" that "[n]o Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." *See Am. Healthcare Admin. Servs., Inc. v. Aizen,* 285 A.3d 461, 487-88 (Del. Ch. 2022) (citing 1 Cowp. 341, 98 Eng. Rep. 1120 (KB)).

[182] Dkt. 108 at 27; Dkt. 86.

[183] Dkt. 108 at 28 (alleging that the court should not consider parol evidence since the Charter is unambiguous). The defendants also filed a motion in limine to exclude extrinsic evidence. Dkt. 152. This motion was resolved above in connection with the analysis of ARC's breach of contract claim. *See supra* Section II.A; *see also supra* note 116.

## III. CONCLUSION

For the reasons stated above, ARC has prevailed in part on its claim that DWAC breached Section 4.3 of the Charter by excluding certain securities from its calculation of the Conversion Ratio. ARC is entitled to an order specifically enforcing Section 4.3 of the Charter based on the correct Conversion Ratio of 1.4911:1 and to related declaratory relief.

ARC has failed to prove its breach of fiduciary duty claims.

The defendants' affirmative defenses are excluded as untimely and are otherwise deficient.

Given the looming expiration of the lockup, an implementing order has been filed contemporaneously with this memorandum opinion. The parties are to inform the court of any remaining matters to be addressed, as detailed in that order.